**TOBIN, Secretary of Labor v. FLOUR MILLS OF AMERICA, Inc.**

No. 14157.

United States Court of Appeals Eighth Circuit.

Dec. 5, 1950.

597

E. Gerald Lamboley, Attorney, United States Department of Labor, Washington, D. C. (William S. Tyson, Solicitor, Bessie Margolin, Assistant Solicitor and William A. Lowe, Attorney, all of Washington, D. C., and Francis M. Cook, Regional Attorney, Kansas City, Mo., on the brief), for appellant.

E. P. Mitchell, Jr., Kansas City, Mo. (Sebree, Shook, Hardy & Hunter, and Edgar Shook, all of Kansas City, Mo., on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

The Administrator of the Wage and Hour Division, United States Department of Labor, brought this action to enjoin the appellee from alleged violations of the provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., regarding overtime, record keeping, and the shipment in interstate commerce of goods produced in violation of the Act.[1] This appeal is from the judgment of the District Court denying the injunction.

Under section 22, 5 U.S.C.A., and Reorganization Plan No. 6 of 1950 (15 F.R. 3174), the Secretary of Labor succeeded to the Administrator's right to prosecute this action after the filing of the appeal in this court. By order of this court the Se-

1. The sections of the Act are sections 7 (a), 11(c), and 15(a) (1), (a) (2), and (a) (5) of the Fair Labor Standards Act of 1938.

cretary of Labor has been substituted as plaintiff-appellant in the action.

The facts as stipulated by the parties and found by the District Court may be summarized. The appellee, Flour Mills of America, Inc., is a corporation engaged in buying, storing, and selling wheat and other grains; in manufacturing wheat into flour and flour by-products; in the operation of grain elevators and flour mills; and in distributing flour and flour by-products in interstate commerce.

The appellee operates a flour mill and mill elevator in St. Louis, Missouri, doing business under the name of Valier-Spies Milling Company. The storage capacity of the terminal elevator is 2,180,000 bushels, and of the mill elevator, 340,000 bushels. The flour mill has a daily capacity of 11,-500 hundredweight of flour, and during the period involved in this action milled 17,-307,438 bushels of wheat.

The appellee also owns and operates six country grain elevators involved in this action. The parties have stipulated that the operations at three of the elevators in Missouri are typical of the operations of all of them. These elevators are located in Marthasville, Rhineland, and McKittrick, small villages in Missouri, and do business under the name of Valier-Spies Milling Company. All grain receipts, warehouse slips, and other stationery or papers used by them carry this name. They are under the general direction of officials of appellee's Grain Department at Kansas City, and all operating and personnel policies are determined by the supervisory official in appellee's Grain Department, whose place of business is in St. Louis, and whose office is located in the offices of the St. Louis flour mill. The official of the Grain Department in St. Louis is under the supervision and control of appellee's vice-president in charge of appellee's grain operations in Kansas City. All personnel and operating records of the country elevators are kept in appellee's office at Kansas City, except that the payroll records for the Missouri country elevator employees are kept in St. Louis, and the pay checks issued from the St. Louis office. Appellee's terminal elevator at St. Louis is under the management and supervision of appellee's Grain Department at Kansas City.

In the day-to-day operations of the St. Louis flour mill, when a contract for the sale of flour is made by the mill, it places an order with the terminal elevator for wheat of the various grades and kinds required by the mill to manufacture the particular grade of flour for which it has an order. The flour mill's orders of wheat are filled by the terminal elevator at the time of the actual milling of the flour.

The storage capacities of the country elevators at Marthasville, Rhineland, and McKittrick are, respectively, 20,000, 8,000, and 6,000 bushels. In the regular operation of these elevators wheat and coarse grain, such as corn, oats, and soybeans, are received from producers located in the vicinity of the elevator. The country elevator employees weigh, test, grade, and handle the grain. On delivery of grain to one of the country elevators its employees unload the grain into dump pits, elevate the grain for storage in the elevator, and turn, fumigate, and aerate the grain while it is in storage.

Grain received at the country elevator is purchased from the local producer upon delivery, or received for storage for the producer and later purchased. The grain is paid for by drafts drawn by the elevator manager to the order of the producer upon appellee's bank account in St. Louis. The country elevator employees weigh the grain upon delivery at the elevator, issue drafts in payment for it and scale tickets exchangeable for warehouse receipts for the grain received for storage. During the period of time involved in this action no grain was accepted for storage at the Rhineland elevator, but all grain delivered to that elevator was purchased upon delivery.

The country elevator employees also load grain from the elevator into railroad cars for shipment, and perform such operations as are necessary to the receiving, handling, storing, and shipping of grain. They are also engaged in local merchandising operations, including local sales of grain, mixed

feeds, concentrates, coal, lumber, and farm hardware supplies.[2]

None of the country elevator employees work in appellee's facilities at St. Louis. Approximately 50 per cent of their working time is devoted to handling wheat[3] and other grains, the remaining 50 per cent to the merchandising operations mentioned above. Approximately 25 to 30 per cent of their total working time is devoted to handling wheat. Appellee usually employs three employees at its Marthasville elevator, one at McKittrick, and one at Rhineland. During rush seasons temporary employees, numbering from two to five, are employed for short periods.

All wheat received at the country elevators is soft red wheat. Other soft wheat different from that received at the country elevators is necessary to the production of flour in appellee's mill. Appellee purchases at the country elevators soft red wheat although it is unfit for milling into flour.

There is an adequate supply of soft red wheat in the St. Louis market. Over 50 per cent of all wheat received in St. Louis is soft red wheat. For the period involved in this action more than 81,000,000 bushels of wheat of all types was received at St. Louis. During this period appellee sold nearly twice as much soft red wheat out of its terminal elevator as it received from its country elevators, and sold more than twice as much soft red wheat as it received from these elevators and subsequently processed into flour. Country grain elevators are a declining operation of appellee's business. From an original ownership of 106 elevators, appellee now operates only 29. It has sold more elevators in the St. Louis area than it now operates. During the period involved in this case, extending from June 1, 1946, to March 31, 1949, of the soft red wheat received at appellee's terminal elevator in St. Louis, approximately 84.45 per cent was processed and 15.55 per cent was sold to outsiders.

The parties stipulated that appellee's total purchases of wheat during the period involved in this action, including the wheat purchased on delivery and wheat stored by producers, the total purchases of coarse grain, and the total purchases of wheat which were milled in the St. Louis mill were as follows:

| | | |
|---|---|---|
| Wheat purchased | 510,297 | bushels |
| Coarse grain purchased | 305,428 | " |
| Wheat milled | 364,223 | " |

From this stipulation it appears that 146,074 bushels or approximately 28 per cent of the total wheat purchased at the country elevators was not milled by appellee.

In addition to the facts stated it appears from the uncontroverted testimony on behalf of appellee that because of the limited storage capacity of the country elevators it is necessary during the harvest season to ship the wheat received by them as soon as possible to the terminal elevator in St. Louis; that on the arrival of a car of wheat at St. Louis a State inspector ex-

2. The parties have stipulated, however, that the exemption contained in section 13(a) (2), commonly known as the "retail or service exemption" is not available to the employees at the country elevators.

3. Witnesses for appellee testified that 75 per cent of the wheat handled at the country elevators was received during the harvest season. The appellant has stipulated that "in the event it is determined that the employees employed by defendant at its aforesaid country elevators are entitled to the benefits of the Act, then in that event the industry exemption contained in Section 7(b) (3) of the Act and familiarly known as the 14-workweek exemption, would be available and applicable to the employees at the three elevators if properly taken, provided they were not employed during such 14-workweek period in excess of 12 hours per day or 56 hours per week before the payment of overtime."

Section 7(b) (3) of the Act exempts from its coverage employment "for a period or periods of not more than fourteen workweeks in the aggregate in any calendar year in an industry found by the Administrator to be of a seasonal nature, and if such employee receives compensation for employment in excess of twelve hours in any workday, or for employment in excess of fifty-six hours in any workweek, as the case may be, at a rate not less than one and one-half times the regular rate at which he is employed."

amines the wheat and reports the grade to the St. Louis Merchants Exchange. The appellee does not know at the time of a shipment of wheat from the country elevator to ·St. Louis whether the wheat will be milled or sold on the market. The ultimate destination of the wheat depends on whether it is fit for milling and the condition of the market on the day of its arrival at St. Louis. If the market is good, the wheat may be and frequently is sold although of excellent milling quality.

It also appears from this testimony that wheat of the character handled at the country elevators is rather high in moisture content, that it can not be safely stored on the average farm, and that to prevent spoilage it is necessary that the producer move his wheat to an elevator for market or for proper storage as soon as possible.

Section 13(a)(10) of the Fair Labor Standards Act exempts from the coverage of the Act "Any individual employed within the area of production (as defined by the Administrator), engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products".

Appellant concedes that the employees of appellee's country elevators are engaged in handling, storing, and preparing in their raw or natural state agricultural commodities within the area of production, as defined by the Administrator, within the meaning of section 13(a)(10) and Regulation 536.2 (29 C.F.R. 170), effective December 18, 1946, promulgated by the Administrator, defining the term "Area of production." [4] But appellant contends that appellee's country elevator employees are not exempt within the meaning of section

---

**4.** § 536.2 *"Area of production" as used in section 13(a) (10) of the Fair Labor Standards Act.* (a) An individual shall be regarded as employed in the "area of production" within the meaning of section 13(a) (10) of the Fair Labor Standards Act in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy prdoucts:

(1) If the establishment where he is employed is located in the open country or in a rural community and 95 per cent of the commodities on which such operations are performed by the establishment come from normal rural sources of supply located not more than the following air line distances from the establishment:

(i) With respect to the ginning of cotton—10 miles;

(ii) With respect to operations on fresh fruits and vegetables—15 miles;

(iii) With respect to the storing of cotton and any operations on commodities not otherwise specified in this subsection—20 miles;

(iv) With respect to the compressing and compress-warehousing of cotton, and operations on tobacco, grain, soybeans, poultry or eggs—50 miles.

(b) For the purposes of this section:

(1) "Open country or rural community" shall not include any city, town or urban place of 2,500 or greater population or any area within:

(i) One air-line mile of any city, town, or urban place with a population of 2,500 up to but not including 50,000 or

(ii) Three air-line miles of any city, town or urban place with a population of 50,000 up to but not including 500,-000, or

(iii) Five air-line miles of any city with a population of 500,000 or greater, according to the latest available United States Census.

(2) The commodities shall be considered to come from "normal rural sources of supply" within the specified distances from the establishment if they are received (i) from farms within such specified distances, or · (ii) from farm assemblers or other establishments through which the commodity customarily moves, which are within such specified distances and located in the open country or in a rural community, or (iii) from farm assemblers or other establishments not located in the open country or in a rural community provided it can be demonstrated that the commodities were produced on farms within such specified distances.

(3) The period for determining whether 95 per cent of the commodities are received from normal rural sources of supply shall be the last preceding calendar month in which operations were carried on for two workweeks or more,

13(a)(10) because "Defendant's elevator employees are engaged in the handling of wheat in defendant's elevators as one step in the processing of such wheat at defendant's St. Louis mill and, therefore, said employees are not engaged in the handling or storing of agricultural commodities 'for market.'" The District Court reached the conclusion that appellee's elevator employees were engaged in handling and storing agricultural commodities "for market" within the section of the Act in question, and the correctness of this decision presents the narrow question on this appeal.

We see nothing in Regulation 536.2 relied on by the Administrator which bears in any way upon the precise question here. But the Administrator has interpreted section 13(a)(10) in Interpretative Bulletin No. 14, issued August 21, 1939, as Release No. R-374 of the Wage and Hour Division, from which we quote the following as pertinent to the issue in this case:

"First, the exemption provided in this section is from both the wage and hour provisions of the Act and not only from the hour provisions.

"Second, the exemption provided in this section depends upon the type of activity engaged in by the particular employee. That is, if the employee is engaged in one of the activities described in this section, he is exempt regardless of whether his fellow employees are similarly exempt.

"Third, the words 'for market,' which are found in this section, limit all of the participles which precede it. In other words, the mere 'handling' of an agricultural commodity by an employee does not render him exempt. He must be handling it 'for market.' * * *

"Fourth, the legislative history of this section indicates that the term 'agricultural or horticultural commodities,' as used

in the section, means those commodities as they come from the farm and before any change has been effected in their natural form. * * *

"Handling

"26. The operations included in this term appear to be those physical operations customarily performed in obtaining agricultural or horticultural commodities from producers' farms, transporting them to and receiving them at the establishment, weighing them or otherwise determining on what basis the producer is to be paid, placing them in the establishment where further operations are to be performed, and delivering the commodities to warehouses. * * * Since it makes no difference that the employer does not own the goods being handled, the employees of brokers or commission houses who physically handle the goods may be within the exemption.

*     *     *     *     *     *

"Storing

"28. Operations which appear to be included in this term are those involved in (1) placing agricultural or horticultural commodities in storage rooms or other places where the commodities are to be held prior to further preparation, sale or shipment, (2) taking care of the commodities while they are being so held; and (3) removing them from the storage rooms and transferring them to wagons, trucks, railroad cars, or other conveyances. * * *

*     *     *     *     *     *

"Preparing in Their Raw or Natural State

"33. The operations included in this term may be any of a large number that are performed in connection with many different kinds of agricultural or horticultural commodities. They do not include operations which change the form of the commodity or which are performed after

---

except that until such time as an establishment has operated for such a calendar month the period shall be the time during which it has been in operation.

(4) The percentage of commodities received from normal rural sources of supply within the specified distances shall be determined by weight, volume

or other physical unit of measure, except that dollar value shall be used if different commodities received in the establishment are customarily measured in physical units that are not comparable. [11 F.R. 14648, as amended at 13 F. R. 734]

the commodity leaves its raw or natural state. * * *"

■ In the case of Holt v. Barnesville Farmers Elevator Co., 8 Cir., 145 F.2d 250, 251, we held that the employees of a country grain elevator engaged in the same activities as appellee's country elevator employees in the present case were exempt from the coverage of the Act under section 13(a)(10) and Interpretative Bulletin No. 14, and inferentially at least that the parts of the bulletin pertinent to the issues in that case were in accord with the plain meaning of the section. The only difference between the Holt case and this is to be found in the fact that in this case the country elevators are owned by a company which engages both in the buying and selling of grain and in the milling of wheat, and thus has within its power to determine whether the wheat received at its country elevator and later delivered to its terminal elevator in St. Louis will be sold in its natural state on the open market or delivered to appellee for processing. In this situation we are unable to find a reasonable ground for denying the exemption claimed in this case, accepting as correct the Administrator's ruling that the words "for market," as used in section 13(a)(10), limit all the participles which precede them.

As the Administrator has pointed out in the bulletin quoted, the exemption provided in the section depends upon the type of activity engaged in by a particular employee. We think that under the evidence the country elevator employees were clearly engaged in the handling of agricultural commodities in their raw and natural state for market rather than for processing. This follows from the fact that when the grain is received at the country elevators and handled by the employees there nothing is known of its destination except that ultimately it will move into the channels of trade. On the contrary, the intended destination of all the coarse grain handled at the elevators is conceded to be "for market" as the phrase is used in the section granting the exemption. This is also true of such part of the wheat handled in the country elevator as may be by reason of its grade and quality unfit for milling into flour. As to the remainder of the wheat, its destination after it leaves the country elevator is dependent upon a number of factors none of which has any relation to the activities conducted at the country elevator, such as the market price of wheat at the time it reaches the St. Louis market and while it is stored in the terminal elevator and, during the same period, the orders which appellee's mill has received for flour in the manufacture of which the country elevator wheat is of the required grade and quality.

■ In Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, at page 612, 64 S.Ct. 1215, at page 1219, 88 L.Ed. 1488, in which the Supreme Court held void a definition of "area of production", as used in section 13(a)(10) of the Fair Labor Standards Act, the court pointed out that the most far-reaching of the exemptions provided by the Act was that of employment in agriculture contained in 13(a)(6) of the Act,[5] Section 13(a)(10) was held to be closely related to the agricultural exemption and to apply to "those workers engaged in processes necessary for the marketing of agricultural products". In the concurring opinion of Mr. Justice Roberts it is said 322 U.S. at page 623, 64 S.Ct. at page 1224: "The legislative history makes it clear enough that Congress wished to exempt plants processing agricultural commodities in the locality of the farms which produced the commodities."

And Mr. Justice Rutledge in his dissenting opinion 322 U.S. at page 633, 64 S.Ct. at page 1228 said: "The legislative history discloses one object of the exemption as originally proposed was to protect small farmers, who are unable to perform these operations at the farm and therefore are dependent upon whatever nearby establishments may exist, whether large or small. Various members of the Senate and of the House sponsored amendments for this purpose. As the bills went to conference each contained flat exemptions, substantially covering the activities now specified in

5. Section 13(a) (6) exempts from coverage any employee employed in agriculture.

603

Section 13(a)(10). But the debates in both houses show that even the sponsors of the various amendments differed or were doubtful concerning whether the amendments would give exemption to large plants. There was general agreement that small ones should be relieved from coverage."

The legislative history of section 13(a)(10) is stated at length in footnotes to the majority and dissenting opinions in the Addison case. From that history as well as from the opinions in the Addison case, it appears that Congress in granting the exemption expressed in section 13(a)(10) was acting for the protection of the farmer to make possible the storage and marketing of his crops at reasonable cost in facilities and at markets which he was compelled to use. Certainly Congress did not say, as we must assume it would have said had it so intended, that the fact that the owner of facilities available to a farmer for the marketing and storage of his agricultural commodities might process some of the grain sold by the farmer instead of selling it to third parties for the same purpose would remove employees from the exemption.

The work of appellee's employees at its country elevators was necessary to the marketing by the local farmers of their grain crops in the usual and customary manner. It does not appear that any of the wheat handled at the country elevators was purchased from the farmers for the specific purpose of being milled into flour. The farmers were not concerned with the ultimate destination of the wheat. From the standpoint of both appellee and the local farmer, the wheat was prepared in its raw or natural state for market in the country elevators. What happened to it afterwards has no bearing on the application of section 13(a)(10).

We have not overlooked the rule that exemption from the Fair Labor Standards Act must be narrowly construed and that the interpretations of the Administrator are entitled to respect at the hands of the courts, arguments much stressed by the appellant. See Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52; Miller

Hatcheries v. Boyer, 8 Cir., 131 F.2d 283; Stratton v. Farmers Produce Co., 8 Cir., 134 F.2d 825; Holt v. Barnesville Farmers Elevator Co., supra; A. H. Phillips, Inc., v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095. Nor are the decisions relied on by the appellant as sustaining his contention in this case in point on the precise question here, e.g., Bowie v. Gonzalez, 1 Cir., 117 F.2d 11; Calaf v. Gonzalez, 1 Cir., 127 F.2d 934. These cases were concerned primarily with the exemption granted to agricultural employment by section 13(a)(6) of the Act and only incidentally with section 13(a)(10), and had nothing to do with the meaning of the phrase "for market" as used in that section Cf. Vives v. Serralles, 1 Cir., 145 F.2d 552.

Judgment affirmed.