## MESSENGER et al. v. TRADERS COMPRESS CO.

### Civ. No. 2711.

United States District Court
E. D. Oklahoma.

Oct. 8, 1951.

---

Kay Wilson, Jr., Muskogee, Okl., for plaintiffs.

Earl Street, Dallas, Tex., and C. Ira Funston, Washington, D. C., Office of Solicitor, Department of Labor for intervenor.

Callaway & Reed, Washington, D. C., and C. B. Cochran, of Richardson, Shartel & Cochran), Oklahoma City, Okl., and Frank Brooks, Dallas, Tex., and Lawrence H. Green, Ada, Okl., for defendant.

RICE, Chief Judge.

### Findings of Fact

1. Plaintiffs are five employees of the defendant, Traders Compress Company, a corporation. They filed this action under the provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., seeking to recover the difference between the minimum rate of 75 cents per hour, provided by said Act as amended, effective January 25, 1950, and the rate of 47½ cents per hour which they had actually been paid, and a like sum as liquidating damages. The defendant's answer admits the employment of plaintiffs and that the rate of pay was as alleged in the complaint.

2. After answer was filed by the defendant, Maurice J. Tobin, Secretary of Labor, filed his motion for leave to intervene and attached thereto a copy of petition of intervention. The motion was granted with limitation and at the trial the intervenor was aligned with the plaintiffs.

3. The contentions of the parties to this controversy, as disclosed from the pleadings and agreements of counsel made in open court at the time the matter was presented, may be stated briefly as follows:

Initially, it was the contention of the defendant that it was not, at any time material hereto, engaged in the production of goods for commerce, within the meaning of 29 U.S.C.A. § 203(j). It was contended by the defendant that its Muskogee plant is a retail service establishment within the meaning of 29 U.S.C.A. § 213(a)(2) and, therefore, entitled to the exemption provided for in that section.

At the conclusion of the trial these defenses were abandoned by the defendant. The defendant now contends that at no time material hereto was any of the plaintiffs engaged in interstate commerce or in the production of goods for commerce, so as to come within the provisions of 29 U.S.C.A. §§ 206(a), 203(b) and 203(j). It is further contended that throughout all the periods of employment of the defendant each of the plaintiffs was employed within the actual Area of Production of cotton and, therefore, fully exempt from the minimum wage and overtime provisions of 29 U.S.C.A. §§ 206 and 207. That the Administrator's current definition of Area of Production is unreasonable, invalid, arbitrary and should be held to be void and of no effect.

4. The cause came on for trial before the Court at Muskogee, Oklahoma, on the 29th day of March, 1951. The parties appeared by their respective counsel. At the trial plaintiffs introduced in evidence lengthy stipulation of facts, with numerous appendices attached thereto, which had been signed by the attorneys for the respective parties. Plaintiffs and intervenor relied upon the stipulation of facts and introduced no further evidence. Thereafter the defendant introduced some evidence and, at the conclusion of the hearing, asked and was granted permission to supply additional evidence to be submitted in the form of statements, letters, depositions, etc., in support of its contention that the current definition of Area of Production is invalid and void. Plaintiffs and intervenor made no objection to the form or method of proof, but did not agree that such proof would be competent or material. Neither did plaintiffs and intervenor agree that all of the facts stipulated were competent or material.

5. At the time of the trial plaintiffs were granted permission to amend their complaint to set forth the total number of hours that had been worked by each subsequent to January 25, 1950, and prior to March 23, 1951. There is no dispute as to hours worked by each plaintiff, nor as to the additional amount due as wages and liquidated damages in the event plaintiffs are entitled to recover. The hours worked and the amount claimed by each plaintiff is as follows:

| Plaintiff | Hours Worked | Additional Wages | Liquidating Damages |
|---|---|---|---|
| Joel Franklin Messenger | 299 | $ 82.22½ | $ 82.22½ |
| Jim Northweather | 2753½ | 757.21¼ | 757.21¼ |
| Toby Groves | 1895 | 521.12½ | 521.12½ |
| Haskell Hughes | 2383 | 755.32½ | 755.32½ |
| William McGuire | 146 | 40.15 | 40.15 |

6. The Court finds the facts to be as stipulated in the written stipulation filed herein, and incorporates said stipulation by reference.

7. Defendant, Traders Compress Company, is a corporation engaged in the business of compressing, storing and otherwise handling raw cotton. The defendant owns and operates a plant for this purpose in Muskogee, Oklahoma. The plaintiffs, and each of them, were employed as watchmen at the defendant's Muskogee plant.

8. The duties of each of the plaintiffs were to protect and guard from thieves, vandals, fire and other hazards raw cotton in bales stored in the plant of defendant. As a part of these duties, plaintiffs were required to make periodic rounds of the plant and premises during periods when the same were not open for business, keeping a lookout for any circumstance or condition which might constitute a threat of loss or injury to the cotton stored in the plant and, incidentally, to the plant itself. At no time did any of the plaintiffs physically handle or otherwise physically work upon such cotton.

9. Throughout the period involved, defendant was engaged exclusively as a bailee for hire in compressing, storing and otherwise physically handling baled cotton for market. Baled cotton is an agricultural commodity in its raw or natural state. All services rendered and all operations conducted by the company were or are performed on account of and in accordance with instructions received from the owners of such cotton. Defendant did not at any time own, buy or sell cotton, or for its own account receive, compress, store or otherwise handle or deal with cotton.

10. All of the cotton received, stored, compressed or otherwise handled in defendant's Muskogee plant, was grown on Oklahoma farms and was ginned at and transferred to defendant's Muskogee plant from Oklahoma ginning establishments.

11. While some of such cotton was or will be consumed within the State of Oklahoma, the substantial preponderance of the

cotton stored or otherwise handled in defendant's Muskogee plant during the perior involved, has moved, or will move, in interstate commerce to points in other states and foreign countries.

12. The compression process has no purpose and no effect other than to reduce the size of the bale for economy in the use of transportation and storage facilities. The compression of the cotton and the other named services offered by the cotton compress plant are directly essential to the orderly and economical marketing and distribution of the cotton.

13. Defendant's Muskogee plant is located within the city limits of the city of Muskogee, Oklahoma. The population of Muskogee, according to the 1940 United States Census is 32,332. Tentative reports from the Bureau of Census indicate that the 1950 census will determine the population of Muskogee to be approximately 37,386. After the decision of the Supreme Court of the United States in Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488, the Administrator of the Wage and Hour Division conducted hearings and at the conclusion of said hearings prepared and issued, on December 18, 1946, his definition of Area of Production. Insofar as it pertains to the issues involved in this proceeding, the definition provides as follows:

"'Area of Production' as used in Section 213(a) (1) of the Fair Labor Standards Act.

"(A) An individual shall be regarded as employed in the 'area of production' within the meaning of 13(a) (10) in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products:

"1. If the establishment where he is employed is located in the open country or in a rural community and 95 percent of the commodities on which such operations are performed by the establishment come from normal rural sources of supply located not more than the following airline distances from the establishment:

"(i) with respect to the ginning of cotton—10 miles;

"(ii) with respect to operations on fresh fruits and vegetables—15 miles;

"(iii) with respect to the storing of cotton and any operations on commodities not otherwise specified in this sub-section—20 miles;

"(iv) with respect to the compressing and compress-warehousing of cotton, and operations on tobacco (other than Puerto Rican leaf tobacco), grain, soybeans, poultry or eggs—50 miles.

"(B) For the purpose of this regulation:

"(1) 'Open country or rural community' shall not include any city, town, or urban place of 2,500 or greater population or any area within

"*one* airline mile of any city, town or urban place with a population of 2,500 up to but not including 50,000 or

"*three* airline miles of any city, town or urban place with a population of 50,000 up to but not including 500,000 or

"*five* airline miles of any city with a population of 500,000 or greater

"according to the latest available United States Census.

"(2). The commodities shall be considered to come from 'normal rural sources of supply' within the specified distances from the establishment if they are received (i) from farms within such specified distances, or (ii) from farm assemblers or other establishments through which the commodity customarily moves, which are within such specified distances and located in the open country or in a rural community provided it can be demonstrated that the commodities were produced on farms within such specified distances.

"(3) The period for determining whether 95 percent of the commodities are received from normal rural sources of supply shall be the last preceding calendar month in which operations were carried on for two workweeks or more except that until such time as an establishment has operated for such a calendar month the period shall be the time during which it has been in operation.

"(4) The percentage of commodities received from normal rural sources of supply within the specified distances shall be determined by weight, volume or other physical unit of measure, except that dollar value shall be used if different commodities received in the establishments are customarily measured in physical units that are not comparable."

During the 1949–50 cotton season (August 1949 to July 1950 inclusive) a total of 28,916 bales was received at defendant's Muskogee plant. The proportions of such cotton received from within various airline distances of defendant's plant are shown below:

| Airline Distances | Bales Received (Cumulative Totals) | Percentage of Total Receipts |
|---|---|---|
| 0–50 miles | 22,185 | 76.7 |
| 0–75 miles | 24,779 | 85.7 |
| 0–100 miles | 27,882 | 96.4 |
| 0–125 miles | 28,279 | 97.8 |
| 0–150 miles | 28,379 | 98.1 |
| 0–175 miles | 28,379 | 98.1 |
| 0–200 miles | 28,429 | 98.3 |
| 0–225 miles | 28,729 | 99.4 |
| 0–250 miles | 28,916 | 100.0 |

Of cotton receipts at defendant's Muskogee plant during the 1949–50 season, 17,454 bales or 60.4% were received from within 50 airline miles of the plant and not from places having populations of 2500 or more, 4,371 bales or 16.3% were received from within 50 airline miles of the plant and from places having populations of 2500 or more; 2,732 bales or 9.4% were received from points more than 50 airline miles from the plant and not from places having populations of 2500 or more; and 3,999 bales or 13.9% were received from points more than 50 airline miles from the plant and from places having populations of 2500 or more. During that part of the 1950–51 cotton season prior to trial of this proceeding (August 1950 to February 1951, inclusive) a total of 4,125 bales of cotton was received at defendant's Muskogee plant. That volume of receipts reflects the serious cotton crop failure experienced in Eastern Oklahoma during the 1950–51 cotton season. The proportions of such cotton received from within various airline distances of defendant's plant are as follows:

| Airline Distances | Bales Received (Cumulative Totals) | Percentage of Total Receipts |
|---|---|---|
| 0–50 miles | 3,595 | 87.2 |
| 0–75 miles | 3,853 | 93.4 |
| 0–100 miles | 4,125 | 100.0 |

During the 1950–51 cotton season, to and including the month of February 1951, of the total cotton receipts at defendant's Muskogee plant, 2,806 bales or 68.1% were received from points within 50 airline miles of the plant and not from places

having populations of 2500 or more; 789 bales or 19.1% were received from points within 50 airline miles of the plant and from places having populations of 2500 or more; 198 bales or 4.8% were received from points more than 50 airline miles from the plant and not from places having populations of 2500 or more, and 332 bales or 8.0% were received from points more than 50 airline miles from the plant and from places having populations of 2500 or more. During each of the months of August and September 1949, and June, July, August and September 1950, the numbers of bales of cotton received at defendant's Muskogee plant from points having populations of 2500 or more and from points more than 50 airline miles distant from that plant were less than 5% of total receipts. During each other month of the period involved, cotton received from points more than 50 airline miles from such plant, or from points of 2500 or greater population, or both combined, exceeded 5% of total cotton receipts.

14. In virtually all cases the cotton farmer sells his cotton to a cotton merchant who in turn sells to the textile industries for the manufacture of cotton fabrics. It is the finding of the court that when cotton compressing and warehousing costs increase, the cotton farmer bears a substantial portion of this increase by way of reduced prices from cotton merchants for his product. Without deciding the geographical extent to which an increase in compressing and warehousing costs would thus affect the cotton producer, the Court finds that substantially all of the cotton producing area served by defendant's Muskogee plant would be so affected.

15. In the event of an hourly wage increase at defendant's Muskogee plant, the effect of the supply of farm labor for surrounding areas would merely be nominal.

16. For the ten-year period of 1939-1948, Oklahoma cotton production was 4,-915,226 bales as compared to 113,148,235 bales for the United States as a whole. In the year 1949, of twenty cotton producing states, Oklahoma ranked ninth in total production with 596,304 bales as compared to the national figure of 15,908,591 bales.

For the ten-year period of 1939-48 Muskogee County (the county in which defendant's plant is located) ranked eighth among Oklahoma counties in total production with a 16,392.2 bale annual average production as compared to 518,427.97 bales for the entire state. Over the ten-year period of 1939-48, Muskogee County and counties contiguous to Muskogee County had an annual average production of 58,400.4 bales or 11.88% of the total state production for this period.

17. There are no compress-warehouse plants in the State of Oklahoma that fully comply with the current definition of "Area of Production." There are no compress-warehouse plants or warehouse plants in the Eastern half of Oklahoma that fully comply with the current definition.

18. In employing the plaintiffs at an hourly wage rate less than the minimum prescribed in the Fair Labor Standards Act, defendant acted in good faith and upon a reasonable belief that it was entitled· to the exemption provided in 29 U.S.C.A. § 213(a)(10).

19. The Administrator of the Fair Labor Standards Act has never promulgated a separate definition of the "Area of Production" of cotton or of any other agricultural or horticultural commodity with the exception of dry edible beans and Puerto Rican leaf tobacco.

20. Prior to promulgating the current definition of the "Area of Production" for agricultural and horticultural commodities generally, the Administrator of the Fair Labor Standards Act, through his representatives, conducted a conference and a public hearing at which testimony, recommendations and representations were made on behalf of operators of cotton gins, warehouses and compress warehouse plants, and certain recommendations were made (without regard to factual data relating to cotton) on behalf of certain labor organizations.

21. The record developed in the public hearing conducted on behalf of the Administrator preparatory to issuing the current definition of "Area of Production" indicated that 82% of all cotton compress ware-

house plants in the United States were located in cities or towns having 2500 or greater population and that in all probability there was not a cotton compress warehouse plant in the United States which received as much as 90% of its total cotton receipts from within 50 airline miles of the establishment.

22. At the time of issuing the current definition of "Area of Production" the Administrator made rather lengthy findings in support of the definition. The findings clearly set forth the conflict between the interests of labor on the one hand, and the interests of agriculture on the other. The findings make frequent reference to economic factors and the difference between "rural agricultural" and "urban industrial" conditions. Apparently, the Administrator was confronted with contentions on one hand by the employer groups which, in most instances, were designed to exempt all, or practically all, of the establishments represented by the particular group making the proposal. Whereas, the proposal of labor representatives tended to exclude all urban industrial communities from the "Area of Production" and a disproportionate number of truly rural and agricultural communities. The findings make this statement:

"On the basis of all areas it is my conclusion that a population test of 2500, while not drawing a line between 'urban industrial' and 'rural agricultural' conditions with a fine precision, will come as close to accomplishing this objective as it is possible to come in a general rule applicable to any situation."

My conclusion, after reading the findings of the Administrator, is that he gave undue emphasis to economic considerations.

### Conclusions of Law

1. The Court has jurisdiction of the parties and subject-matter of this action by reason of the fact that the controversy is one arising under the laws of the United States. 28 U.S.C.A. § 1331.

2. The employment of the plaintiffs as watchmen was an occupation closely related and directly essential to the production of goods for commerce, as that term is defined in 29 U.S.C.A. § 203(j), as amended October 26, 1949.

3. The location of defendant's Muskogee Plant and the activities thereof compel the conclusion that at no time material hereto has the defendant complied with the Administrator's definition of "Area of Production."

4. The Administrator's current definition of "Area of Production" does not, in my judgment, define the "Area of Production" of cotton. It has little reasonable or necessary relation to the actual Area of Production, as the term is ordinarily understood. As disclosed from the Administrator's findings, the emphasis was placed upon the economic balance between rural agricultural and urban industrial conditions. If such economic balance is the primary concern, it appears to me that the definition determined in Addison v. Holly Hill Fruit Products case to be invalid was a more understandable and realistic approach than the current definition. I am sure that it was not the intent of Congress, in granting the exemption to compress plants contained in 29 U.S.C.A. § 213(a) (10), to authorize the Administrator so to define "Area of Production" as to eliminate, for all practical purposes, compress warehouses from the exemption. In my judgment, the Administrator's current definition is capricious, arbitrary and has no reasonable relation to the purpose that Section 213(a)(10) was designed to achieve, and is therefore invalid and void.

5. Having reached the conclusion that the current definition is invalid, the Court is of the opinion that no judgment in favor of the plaintiffs is warranted, nor is the Court authorized to dismiss the complaint of plaintiffs or to render judgment for the defendant against the plaintiffs. As I construe the opinion of the Supreme Court, this Court may not define "Area of Production" nor determine from the evidence that defendant is within the "Area of Production" and, therefore, exempt. As between the plaintiffs and defendant the only thing the Court is warranted in doing is to deny any relief to either of said parties, retaining jurisdiction

of the matter until such time as the Administrator promulgates a valid definition of the term "Area of Production." However, there is no just reason for delaying judgment denying intervenor's application for injunction. Separate judgments will be entered accordingly.

Attorney for the defendant will prepare the decree in conformity with the foregoing Findings of Fact and Conclusions of Law and present to the Court for signing and entering at Muskogee, Oklahoma, on the 29th day of October, 1951, at 10 o'clock A.M.