**WYATT et al. v. HOLTVILLE ALFALFA MILLS, Inc.**

No. 13600.

United States District Court
S. D. California, Central Division.
July 5, 1952.

626

Patrick James Kirby, James M. Hall, Los Angeles, Cal., and William E. Mac-Faden, Redondo Beach, Cal., for plaintiffs.

Moss, Lyon & Dunn, Los Angeles, Cal., James E. Marable, El Centro, Cal., for defendant.

George E. Duemler, Atty., U. S. Department of Labor, Los Angeles, Cal., amicus curiae.

HARRISON, District Judge.

Plaintiff employees have brought this action under the Fair Labor Standards Act, 29 U.S.C.A. § 201, et seq., for overtime wages allegedly due them for work performed for the defendant. Defendant contends that, by reason of certain agricultural exemptions under the act, all the plaintiffs are exempt from its coverage.

It has been stipulated that the defendant is engaged in interstate commerce.

The defendant operates an alfalfa dehydrating and pulverizing plant. Its employees work in shifts of twelve hours per day seven days per week.

Despite earlier assertions, plaintiffs now concede that the statute of limitations bars all claims for a period two years prior to the date of the filing of their written consents, 29 U.S.C.A. §§ 255(a), 256. The consents of all plaintiffs except W. B. Franklin were filed on September 13, 1951. The consent of W. B. Franklin was filed on October 9, 1951.

Most of the facts in this case have been stipulated by the parties. Because of various requirements under each of the four exemptions claimed it is necessary to analyze the work done by the various classes of employees and the nature of the employer's business.

## Defendant's Operations

Defendant is a California corporation with its office, plant and equipment located a little more than a mile beyond the city limits of the City of Holtville, in Imperial County, California. Defendant owns field equipment, motor trucks and an alfalfa dehydrating and pulverizing mill and machinery.

The defendant does not own or rent farms nor does it grow any alfalfa on land owned by it. It does, however, negotiate with farmers for the purchase of their respective crops of mature alfalfa, and purchase same, crop by crop, at or about the time they mature. The fields from which these crops are purchased are located between one-half mile and eighteen miles from defendant's premises.

For approximately seven months of the year, the defendant programs its operations on a basis of twenty-four hours a day, seven days a week. The remainder of the year it operates twelve hours a day, seven days a week. Defendant's operations are year-round, although not as extensive during the five summer months as in the other seven months. This year-round schedule is the exception rather than the rule in the alfalfa dehydrating industry, including defendant's competitors in the Imperial Valley.

Defendant's employees may be divided into three general classifications: field workers, truck drivers and mill workers.

## Field Workers

These employees are engaged in mowing, raking, chopping and removing by truck the alfalfa from the fields to which they are assigned by defendant. The field implements used include mowers, rakes and choppers and are all tractor powered. Approximately three mowers, three rakes and two choppers operate with the truckers as a field unit. These field employees are rarely, if ever, employed during the same work-week to operate more than one of the implements mentioned.

The entire mowing, raking, chopping and loading operations are synchronized. In a typical operation, the mowers, rakes and choppers, each drawn by a tractor, arrive at the field together. The mowers cut the crop. They are followed by rakes which collect and form the cut alfalfa into windrows. The rakes, in turn, are followed by the choppers, which as part of this synchronized operation, pick up the alfalfa from the windrows, chop it and blow it into the truck bed. The chopper has an individual motor to drive the lawnmower-like blades and operate the blowing device which blows the chopped alfalfa through a long, funnel-like attachment directly into the truck bed. The loading of the truck is automatic from the chopper to the truck. When the truck is fully loaded, it proceeds to defendant's premises, its place being taken by another truck.

In addition to the above mentioned employees, a maintenance man and truck are kept in the field on the day shift. He spends approximately ninety percent of his time servicing the machinery in the field and making minor repairs and part replacements. He returns to the mill only for major repairs on equipment and service his truck.

## Truck Drivers

The work of these employees, while on the alfalfa fields, has been described. Upon arrival at the mill with a full load, the drivers back up their truck to a self-feeder or leave it in the yard for others to

handle. They then drive their trucks back to the fields as soon as empty vehicles are available.

### Mill Employees

The mill employees include a mill operator, mill operator assistants, bag-off men, sack sewers and car loaders. From the self-feeding device, the alfalfa passes through one of three dehydrators, then into a pulverizing and crushing machine, through a sifter, and then into a mixing box and finally into bags, or into a bin and thence through a pellet producing machine. The mill operator and his assistants are responsible for the passage of the alfalfa through these various operations. The bag-off men put the pulverized alfalfa into 100-pound sacks; the sewers sew the sacks; and, the loaders load the sacks from a conveyor into railroad cars for shipment.

A maintenance mechanic and his assistant maintain the equipment at the mill, and they, too, are included in this category of mill employees.

### Exemptions Claimed by the Defendant

1. Section 13(a) (6) of the Fair Labor Standards Act, 29 U.S.C.A. § 213(a) (6):

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to * * * (6) any employee employed in agriculture; * *."

Agriculture is defined as follows by § 3(f) of the Act, 29 U.S.C.A. § 203(f):

" 'Agriculture' includes farming in all its branches and among other things includes * * * harvesting of any agricultural or horticultural commodities * * * and any practices * * * performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, * * *."

The exemption of § 13(a) (6) is claimed only for the so-called field employees.

Preliminarily, I may note that counsel for the plaintiffs make much of the fact that the defendant is a commercial industry. There is little room for argument on that score. The test under the Act, however, is the nature of the employee's activities, and not the character of the employer's business. In Kam Koon Wan v. E. E. Black, Limited, 188 F.2d 558, 562, the Court of Appeals for this Circuit stated:

"* * * Coverage of the Act depends upon the character of the employee's activities, and not upon the nature of his employer's business. * * *"

In Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. 755, 762, 69 S.Ct. 1274, 1278, 93 L.Ed. 1672, the Supreme Court carefully considered the statutory definition of "agriculture".

"As can be readily seen, this definition has two distinct branches. First, there is the primary meaning. Agriculture includes farming in all its branches. Certain specific practices such as cultivation and tillage of the soil, dairying, etc., are listed as being included in this primary meaning. Second, there is the broader meaning. Agriculture is defined to include things other than farming as so illustrated. It includes any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidently to or in conjunction with 'such' farming operations."

The Administrator's Interpretative Bulletin No. 14, par. 5 [3 C.C.H. Labor Law Reporter, § 24,488] provides:

"* * * The term 'harvesting of any agricultural or horticultural commodities' includes all operations customarily performed in connection with the removal of the crops by the farmer from their growing position in the field, greenhouse, etc. * * *"

[2] The mowermen and rakemen are engaged in such operations, and their activities fall within the so-called "primary" meaning of "agriculture". Accordingly, they are exempt under § 13(a)(6) from coverage.

Initially, I had some difficulty in determining the status of the choppermen. After reviewing the evidence, however, I am satisfied these employees also are exempt

from coverage. The facts here disclose the entire operation of harvesting and chopping to be an integrated and simultaneous operation. I believe the work of the choppermen may be said to fall within either the primary or secondary meaning of "agriculture". It is most difficult to draw the line between where the "harvesting" ends and when the "on farm" activities incidental to the farming operations begin. There is no need to draw that line in this case. The choppermen are exempt from coverage by reason of the agricultural exemption afforded by § 13 (a)(6).

The last of the field employees to be considered is the field maintenance man. As revealed above, this employee spends approximately ninety percent of his time in the field. The remaining portion of his workweek is spent at the defendant's plant where he services and repairs the equipment used.

The rule is well settled that an exemption cannot be had under the Fair Labor Standards Act unless the employee's *entire* workweek is spent in the exempted activity. In other words, if, during any workweek an employee performs work some of which is exempt under the section and some of which is not exempt, the exemption does not apply to him during such a workweek. Fleming v. Swift & Co., D.C., 41 F.Supp. 825, 832, affirmed Walling v. Swift & Co., 7 Cir., 131 F.2d 249; Walling v. DeSoto Creamery & Produce Co., D.C., 51 F.Supp. 938, 943; Shain v. Armour & Co., D.C., 50 F.Supp. 907, 911; Walling v. Peacock Corp., D.C., 58 F.Supp. 880, 883; McComb v. Puerto Rico Tobacco Marketing Co-op. Ass'n, D.C., 80 F.Supp. 953, 957, affirmed 1 Cir., 181 F.2d 697; Waialua Agr. Co. v. Maneja, D.C., 97 F.Supp. 198, 232. As some of the employee's workweek is spent "off the farm", defendant is not entitled to the section 13(a)(6) exemption for the maintenance man.

2. Section 13(a)(10) of the Fair Labor Standards Act, 29 U.S.C.A. § 213(a)(10):

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to * * * (10) any individual employed within the area of production (as defined by the Administrator), engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products; * * *."

This exemption is claimed for all the employees of defendant. Inasmuch as I have held all the field employees, other than the maintenance man, to be exempt from coverage by reason of § 13(a)(6), I need only discuss the maintenance man and defendant's other employees.

The activities enumerated in the section must be performed on "agricultural or horticultural commodities", within "the area of production", and "for market". With the "area of production" requirement, I shall not concern myself. The original definition promulgated by the Administrator has been declared invalid, Addison v. Holly Hill Fruit Products Inc., 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488. The validity of the newer definition has been challenged. Messenger v. Traders Compress Company, D.C., E.D.Okl., 107 F.Supp. 354.

Assuming that these plaintiffs are employed within the "area of production", and assuming further that each is engaged in one of the practices enumerated in the section, I must still find that none of the remaining employees are exempt by virtue of § 13(a)(10).

One of the requirements in the section is that the "handling" or "packing" be "for market". Interpretative Bulletin No. 14, par. 25, provides:

"Third, the words 'for market', which are found in this section, limit all of the participles which precede it. In other words, the mere 'handling' of an agricultural commodity by an employee does not render him exempt. He must be handling it 'for market'. * * * "

It is obvious that all commodities, except those used for a farmer or manufacturer's own consumption, are handled or packed

for an eventual market. Were this the test, the requirement would be meaningless. A line, therefore, must be drawn at some point.

Counsel have referred me to but one case which has discussed, at any considerable length, this particular requirement of the section. In Tobin v. Flour Mills of America, 8 Cir., 185 F.2d 596, 602 the particular employees handled wheat at country elevators. No one, at the time of the "handling", could foresee whether the wheat would be sold in its then state or whether it would be delivered to the employer's St. Louis mills for processing. The Court stated:

"* * * In this situation we are unable to find a reasonable ground for denying the exemption claimed in this case, accepting as correct the Administrator's ruling that the words 'for market,' as used in section 13(a)(10), limit all the participles which precede them.

"As the Administrator has pointed out in the bulletin quoted, the exemption provided in the section depends upon the type of activity engaged in by a particular employee. We think that under the evidence the country elevator employees were clearly engaged in the handling of agricultural commodities in their raw and natural state *for market rather than for processing.* This follows from the fact that when the grain is received at the country elevators and handled by the employees there nothing is known of its destination except that ultimately it will move into the channels of trade. * * *" (Emphasis supplied.)

The Court went on to note:

"* * * It does not appear that any of the wheat handled at the country elevators was purchased from the farmers for the specific purpose of being milled into flour. * * *"

■ The Court, then, did distinguish between two types of "handling," e. g. "for market" and "for processing". In this case, the alfalfa was handled in the fields for the specific purpose of processing it at the defendant's plant. The farmers knew this; the field employees knew this; and, defendant knew it. All knew that there would be one further step before defendant would cause the alfalfa to "move into the channels of trade". The maintenance man and the truck drivers, therefore, cannot be held exempt from coverage by reason of this section. They are "handling" not "for market" but for further processing. There is no need to go further and determine whether the chopped alfalfa which they do handle is an "agricultural or horticultural" commodity.

■ There is, however, a need to determine whether defendant's completed product is such an "agricultural or horticultural" commodity. Unlike the truck drivers and the maintenance man, the mill employees are "handling" and "packing" "for market". No further processing is contemplated before the alfalfa is marketed by the defendant.

The stipulations disclose that the alfalfa passes through the various processes at defendant's plant without being handled manually by any of the mill employees as it is sucked or blown from one piece of machinery to another. Thus, some, if not all, of the "handling" of the alfalfa by any of these employees occurs after the dehydration and pulverizing processes. It is further stipulated that the dehydration process causes a loss of one of the forms in which the chemical B-carotene is found in fresh alfalfa. In fresh alfalfa, B-carotene occurs almost entirely in three forms: About 86% all trans, 6% neo beta B and 8% neo beta U. The dehydration causes a loss of all trans and a corresponding increase of the other two forms. Further, the dehydration processes cause an increase in the units of pro-vitamin A per pound.

Interpretative Bulletin No. 14, par. 25, provides:

"Fourth, the legislative history of this section indicates that the term 'agricultural or horticultural commodities', as used in the section, means those commodities as they come from the farm and before any change has been effected in their natural form. * * *"

■ The courts have ruled in such a way as to indicate the words "raw or natural state", which prima facie would seem to apply only to the word "preparing", qualify all the other. activities enumerated in the section. In other words, for a commodity to be "agricultural" it must still be in its "raw or natural state". See Puerto Rico Tobacco Marketing Coop. Ass'n v. McComb, 1 Cir., 181 F.2d 697, 701; Abram v. San Joaquin Cotton Oil Co., D.C.S.D.Cal., 46 F.Supp. 969, 973; Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 19. The cases of McComb v. Hunt Foods, 9 Cir., 167 F.2d 905, 907, and McComb v. C. H. Musselman ·Co., 3 Cir., 167 F.2d 918, 919, are not authority to the contrary. Neither court was concerned with the exemption of section 13(a)(10), but rather with that of section 7(c). The question in each case involved the "first processing" requirement of that latter section. The language of this Circuit in the Hunt Foods case does not require a holding that this dehydrated alfalfa is still in its natural form. The Court there stated [167 F.2d 907]:

> " * * * The fact that the whole apple has been cut up does not lead to the conclusion that the resulting parts of the apple are not still in a raw and natural state, any more than if the apple had been merely dimidiated. * * * "

■ Here, there has been more than a cutting up of the alfalfa. There has been a change in the chemical content of the commodity, the change being due to the dehydration process. Certainly there can be no doubt that the processes effect a change in the "natural form" of the alfalfa. The commodity handled by the mill employees is not an agricultural commodity, but one produced by an industrial process. None of the mill employees, therefore, are exempt by reason of this section.

I may further note that there is no question whatsoever as to the status of the maintenance mechanic and his assistant. Not only are their co-workers at the mill not "handling" an "agricultural or horticultural" commodity, but these two employees are not engaged in any of the practices enumerated in § 13(a)(10). The two mechanics do not handle, pack, or store, any agricultural commodity. Their "handling" is confined to the mill machinery.

■ 3. Section 7(b)(3) of the Fair Labor Standards Act, 29 U.S.C.A. § 207(b)(3):

> "(b) No employer shall be deemed to have violated subsection (d) of this section by employing any employee for a workweek in excess of that specified in such subsection without paying the compensation for overtime employment prescribed therein if such employee is so employed—
>
> * * * * * *
>
> "(3) for a period or periods of not more than fourteen workweeks in the aggregate in any calendar year in an industry found by the Administrator to be of a seasonal nature,
> and if such employee receives compensation for employment in excess of twelve hours in any workday, or for employment in excess of fifty-six hours in any workweek, as the case may be, at a rate not less than one and one-half times the regular rate at which he is employed."

The Administrator has determined that the industry of artificial drying of hay and the subsequent manufacture of meal therefrom is of a seasonal nature, 5 F.R. 4801. The test under this particular subsection is not the operation of the individual employer, but that of the industry as a whole. If the industry is seasonal in nature, the benefit of such a finding extends to every employer in that industry, even though the particular employer's operations may not, in fact, be seasonal. Hendricks v. Di Giorgio Fruit Corp., D.C., 49 F.Supp. 573; 3 C.C.H. Labor Law Reporter, par. 25,250.

■ This requirement, however, is not the sole pre-requisite to exemption under the section. An express condition precedent appears on the face of the section, namely, that the employee receive compensation for employment in excess of fifty-

six hours in any workweek at one and one-half times the regular rate. In Walling v. Lincoln Looseleaf Warehouse Co., D.C., 59 F.Supp. 601, 604, the Court held:

"* * * The exemption available to defendant under section 7(b)(3) is inoperative in workweeks when hours are worked in excess of twelve a day or fifty-six a week unless overtime compensation for such excess hours is paid."

The defendant not having complied with this requirement, a plain reading of the section compels the conclusion that it cannot claim its exemption for any of its employees.

■■■ 4. Section 7(c) of the Fair Labor Standards Act, 29 U.S.C.A. § 207(c):

"* * * and in the case of an employer engaged in the first processing of, or in canning or packing, perishable or seasonal fresh fruits or vegetables, or in the first processing, within the area of production (as defined by the Administrator), of any agricultural or horticultural commodity during seasonal operations, * * * the provisions of subsection (a) of this title, during a period or periods of not more than fourteen workweeks in the aggregate in any calendar year, shall not apply to his employees in any place of employment where he is so engaged."

I shall not concern myself with the "area of production" requirement for the reasons heretofore stated. Unlike § 7(b)(3), this section does not set up a test based on the operations of the industry as a whole. The language here is "in the case of an *employer* engaged in * * * the first processing * * * of any agricultural or horticultural commodity during seasonal operations * * *." [Emphasis supplied.] Whether the industry is seasonal in its nature is immaterial; the individual employer's operations must be seasonal. It is somewhat difficult for me to understand how an employer who operates twenty-four hours a day during seven months of the year, and twelve hours per day during the remaining five months can claim that his operations are seasonal.

Although the case of McComb v. Hunt Foods, Inc., 9 Cir., 167 F.2d 905, seems to sustain the defendant's argument that his operations constitute the "first processing", I cannot ignore the requirement that the particular employer's operations be seasonal. Defendant's operations not being seasonal, it cannot claim the exemption of § 7(c).

### Did Defendant Commence to Pay Certain of the Mill Employees Overtime on March 24, 1950?

■■■ The evidence disclosed that defendant's books reflected no overtime payments to any of its employees until March 24, 1950. Up to that time the hourly wage for certain of the mill employees was one dollar per hour with no overtime compensation. On that date, however, the rate of pay was reduced to eighty cents regular time and a dollar and twenty cents overtime. The result of this reduction was that the employees' weekly remuneration became $84.80 rather than the $84 previously received. Defendant's general manager testified that he told the superintendent of this change, but no actual knowledge on the part of the employees concerned was shown. The eighty cents difference leaves little room for speculation that those employees were put on notice of such a change.

In 149 Madison Ave. Corp. v. Asselta, 331 U.S. 199, 204, 67 S.Ct. 1178, 1181, 91 L.Ed. 1432, the Supreme Court stated:

"We have held that the words 'regular rate,' while not expressly defined in the statute, '* * * mean the hourly rate actually paid for the normal, non-overtime workweek.' Walling v. Helmerich & Payne, Inc., 1944, 323 U.S. 37, 40, 65 S.Ct. 11, 13, 89 L.Ed. 29. The regular rate is thus an 'actual fact,' and in testing the validity of a wage agreement under the Act the courts are required to look beyond that which the parties have purported to do. Walling v. Youngerman-Reynolds Hardwood Co., 1945, 325 U.S. 419, 424, 65 S.Ct. 1242, 1244, 89 L.Ed. 1705. * * *"

The hourly rate actually paid here remained one dollar per hour. The parties "purported to do" nothing. As a result of the unilateral action of the employer, and without the knowledge or consent of the employees so-called overtime was paid. Fundamental contract law requires me to ignore this mere bookkeeping change and to hold that the overtime requirements of the Act were not satisfied.

## Liquidated Damages

■ Plaintiffs have prayed for liquidated damages for the periods involved. 29 U.S.C.A. § 216. The uncertainty existing among members of defendant's industry, in general, as to their status under the Act, and the inherent confusion in the language of the exemptions claimed to be applicable to various practices associated with agriculture leads me to believe that defendant's omission to pay overtime compensation to any of the plaintiffs entitled to recover was, with but one exception, in good faith. The sole exception involves those mill employees discussed above whose employment records were caused to reflect a fictitious overtime payment as of March 24, 1950. Defendant's action, as to those employees, reflected bad faith, and those employees are entitled to liquidated damages from that time on. Defendant's omission to pay overtime compensation to the other employees being in good faith, no liquidated damages shall be awarded them. Section 11 of the Portal-to-Portal Pay Act of 1947, 29 U.S.C.A. § 260.

## Attorney's Fees And Costs

■ Plaintiffs contend they are entitled to judgment for all costs incurred by them, including fees of accountants employed by plaintiffs. The statute not providing for such accountants' fees, and counsel not having cited any authority authorizing such an allowance, I must disallow that claim.

As stated in Conwell v. Central Missouri Telephone Co., D.C., 76 F.Supp. 398, 407:

> " * * * In any case the fee allowed should bear some relation to the amount of work performed by counsel and to the amount of recovery."

Accordingly, the determination of the attorney's fees to be allowed must await the calculations yet to be performed in arriving at the amount of recovery in this action.

## Interest

■ Plaintiffs' position is that the passage of the Portal-to-Portal Pay Act of 1947 changed the prior rule excluding an award of interest, Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296, inasmuch as the Act provided the awarding of liquidated damages to be a question for the discretion of the trial court. See Asselta v. 149 Madison Ave. Corp., D.C., 95 F.Supp. 856, 858. Two Courts of Appeals have held otherwise, Clougherty v. James Vernor Co., 6 Cir., 187 F.2d 288, 293; Landaas v. Canister Co., 3 Cir., 188 F.2d 768, 772, and I feel constrained to follow their authority. Accordingly, no interest will be granted to those plaintiffs successful in this action. And, in any event, the case of Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296, is an absolute bar to the granting of interest to those employees who have been held entitled to liquidated damages.

Counsel have indicated that upon my ruling covering the issues of law involved, they would be able to stipulate to the amount of any recovery. In the event they fail to do so within thirty days from date of this opinion, I shall proceed to take further evidence on the amounts to which each employee is entitled. Upon the filing of such stipulation counsel for plaintiffs is directed to submit without delay proposed findings and judgment. See Waialua Agr. Co. v. Maneja, 9 Cir., 178 F.2d 603.