Lisa A. HULTGREN; Victoria M. Smith; and Daniel R. Turner, Appellees,

v.

COUNTY OF LANCASTER, NEBRASKA, a political subdivision of the State of Nebraska, Appellant.

No. 89–2391.

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1990.

Decided Sept. 4, 1990.

Michael E. Thew, Lincoln, Neb., for appellant.

James D. McFarland, Lincoln, Neb., for appellees.

Before MAGILL and BEAM, Circuit Judges, and LARSON,* Senior District Judge.

LARSON, Senior District Judge.

This case arises under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.* Certain "relief employees" hired by the Lancaster Office of Mental Retardation to work in residential facilities for the mentally retarded brought suit alleging that failure to compensate them for "sleep time" violated the FLSA. The case was

---

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

tried by consent before a magistrate, who found, after an extensive review of the facts, that plaintiffs' "sleep time" constituted working time under the FLSA. Ruling that Lancaster County was not entitled to a good faith defense under the Portal to Portal Act, 29 U.S.C. § 259, the magistrate awarded plaintiffs damages of $23,056.10 for uncompensated hours from April 15, 1986, the date the Fair Labor Standards Act became applicable to local governments, to February 18, 1988, the date plaintiffs filed their complaint. The magistrate concluded that liquidated damages were also warranted for a portion of the time claimed by the plaintiffs pursuant to 29 U.S.C. § 260.

This appeal followed. We affirm the judgment below insofar as it imposes liability under the FLSA, but reverse the award of liquidated damages and remand for consideration of whether plaintiffs are entitled to prejudgment interest. Our review of the record convinces us that plaintiffs are entitled to recover unpaid wages, but that requiring the county to pay liquidated damages, under all the relevant circumstances herein, would be unjust.

## I.

The County of Lancaster, through the Lancaster Office of Mental Retardation (LOMAR), operates numerous residential facilities for mentally retarded individuals. Although each residential facility is unique, they all are staffed under the same general conditions. Most have a residential manager who lives on the premises for extended periods of time, usually five or six consecutive days. "Relief employees," formally known as human service instruction assistants (HSIAs), take the place of the residential managers one or two days a week to give the managers time off from their supervisory duties. An HSIA assigned to a typical "relief" shift would report to a facility at 2:45 p.m. in the afternoon and remain on the premises until 8:30 a.m. the next day. Eight hours of the shift, from 11:00 p.m. to 7:00 a.m., would be designated as "sleep time."

Unlike the resident managers, who were hired to care for residents at one facility, HSIAs moved from facility to facility. Accordingly, they "did not have the luxury of knowing the clients as well or having the clients become comfortable with their presence." They also had to adapt to the different sleeping accommodations provided at each facility. In some places, the HSIAs were required to sleep on a couch or a hide-a-bed in the living room. Other facilities had staff bedrooms, which normally were used by the residential managers. Relief employees often slept in the living room even when a separate staff bedroom was available, because of the behavior patterns of the residents and/or the condition of the particular staff bedroom.

Regardless of where they spent their "sleep time," the relief employee's job was "to sleep with one eye and one ear open" to ensure the safety and well-being of the residents. Residents at each facility displayed a variety of behaviors which resulted in numerous interruptions during the nighttime hours. This behavior included attempts to escape or leave the facility, displaying aggressive and self-abusive behaviors, taking frequent loud and disruptive trips to the bathroom and kitchen, urinating in inappropriate places, talking in their sleep, turning on the stereo, being afraid of thunderstorms, attacking other residents, throwing tantrums, having itching attacks, waking up and wandering around, watching the television (which in at least one facility was in the same room where the relief employee was supposed to sleep), asking for cigarettes, and having delusions or coughing attacks.

The frequency and duration of interruptions varied from facility to facility and from night to night, but plaintiffs testified, and the magistrate found, that the interruptions were so numerous that it was impossible for plaintiffs to get even several hours of uninterrupted sleep. Plaintiffs testified they usually went home to sleep after their relief shift ended.

Prior to the Supreme Court's decision in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct.

1005, 83 L.Ed.2d 1016 (1985), HSIAs were not subject to Fair Labor Standards Act compensation requirements and they were hired with the understanding that they would not be paid for eight hours of nighttime duty each relief shift, regardless of whether their sleep was interrupted or not. In *Garcia*, the Supreme Court overruled *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), and held that Congress *could* legislate minimum wage and hour standards for state and local government employees. *See Garcia*, 469 U.S. at 555–57, 105 S.Ct. at 1019–20.[1]

After learning of the *Garcia* decision, LOMAR's executive director contacted the Lancaster County Attorney and received various wage and hour publications addressed to compliance with the FLSA. At issue here are the FLSA requirements for compensation of "sleep time." Regulations of the Department of Labor's Wage and Hour Division address this question. These regulations provide that an employee who works less than 24 hours per shift is considered to be working for the entire shift, even if some of the time is spent sleeping and even if facilities are furnished for sleeping. 29 C.F.R. § 785.21.

Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude eight hours of sleep time "provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep." *Id.* at § 785.22(a). Even where there is an agreement to exclude sleep time, if the employee's sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. *Id.* at § 785.22(b). For enforcement pur-

poses, if an employee cannot get at least five hours' sleep during the scheduled period, the entire time is working time. *Id.*

If an employee resides on the premises on a permanent basis or for an extended period of time, any reasonable agreement which compensates the employee for actual hours worked "which takes into consideration all of the pertinent facts will be accepted." *Id.* at § 785.23.

In interpreting the application of these regulations to the employees who work in LOMAR's residential facilities, LOMAR looked to two position letters from a Deputy Administrator of the Wage and Hour Division received by the Executive Director of the National Association of Private Residential Facilities for the Mentally Retarded.[2] A letter bearing the date February 3, 1981, responds to a request by the association for clarification on "the circumstances under which an employer can deduct from hours worked the time spent by house-parents sleeping at privately-operated community residences for the mentally retarded." After generally describing the schedules of both houseparents and relief employees, the letter further assumes "[t]he houseparents and relief staff sleep in private quarters separate from the mentally retarded residents of the group home." The letter then responds to two questions concerning the compensation of the houseparents. The response to the third question concerns the compensation of relief employees:

> Your third and final question related to employees who do not reside at the community residences but who, as relief employees, remain there for at least 24 hours, and often as long as two or three days. You have informed us that these relief employees, during a 24-hour period, have off-duty time during the day with complete freedom from all responsibilities, thereby enabling them to use the time effectively for their own purposes.

---

1. Congress responded to the *Garcia* decision by giving state and local government agencies some "breathing room" prior to enforcement of the FLSA provisions. *See* Fair Labor Standards Amendments of 1985, Pub.L. No. 99–150, 99 Stat. 787 (1985); S.Rep. No. 99–159, 99th Cong. 1st Sess., at 8 (1985), *reprinted in* 1985 U.S.Code

Cong. & Admin.News 651, 655–56. Since April 15, 1986, however, LOMAR has been subject to FLSA provisions.

2. Private facilities had, of course, been subject to FLSA requirements even prior to *Garcia*.

Such employees, as you have pointed out, are arguably on duty for less than 24 hours. Your specific question is whether the sleep time of such employees can be deducted from working time.

Under the particular circumstances you have described, we believe that such sleep time can be deducted from hours worked, provided that the employer and employees agree in advance to do so, and that no more than 8 hours per night (or actual, uninterrupted sleeptime, if that is less than 8 hours) is deducted. We have reached this conclusion, which represents a departure from the general rule under 29 C.F.R. 785.21, because of the home-like environment afforded to these employees in community residences, with private quarters and other amenities. Even where employees sleep over for only one or two nights, there are ample facilities to enable them to get a full night's sleep.

In situations falling within the general rule which forbids the deduction of sleep time, the demands of the job have seriously interfered with the employee's ability to sleep, or the sleeping facilities have been minimal. Here, however, because of the home-like environment, an exception can be made where employees do in fact get a reasonable night's sleep. In other words, under the particular circumstances described above, we would apply the sleep time rule set forth in § 785.22.

A second letter, bearing a date stamp of August 20, 1985, further clarifies for the association the position taken in the 1981 letter. The 1985 letter explains:

In our February 3, 1981, letter we authorized a departure from the general rules concerning sleeping time in the special case of relief employees who remain on the premises for at least 24 hours, and often as long as two or three days. Such employees, during a 24–hour period, may have some off-duty time during the day with complete freedom from all responsibilities, thereby enabling them to use the time effectively for their own purposes. We nevertheless concluded that sleeping time of such employees could be deducted from hours worked, provided that the employer and employees agree in advance to do so, and provided that no more than 8 hours per night (or actual, uninterrupted sleeping time, if that is less than 8 hours) is deducted. We reached this conclusion because of the home-like environment afforded to these employees in community residences, with private quarters and other amenities. The effect of this conclusion was to permit approximately similar treatment of regular and relief employees.

After four years of experience with the application of these principles to group home settings, the 1985 letter confirms that

the employer and a relief employee who performs essentially the same duties as [the] full-time employees may agree, in advance of performance of any work, that sleeping time of up to eight hours can be excluded from compensable hours of work, regardless of the length of the tour of duty involved.

The letter cautions, however, that "[t]hese exclusions must be the result of an employer-employee agreement and not a unilateral decision by the employer." The letter also emphasizes that

As we indicated in our earlier letter, these special rules for relief employees of community residences apply only where the facilities offered by their employer provide a home-like environment, with private quarters separate from the residents of the home, thus enabling the employee to get a full night's sleep.

Of course, if an employee's sleeping or off-duty time is interrupted by a call to duty, the time worked as a result of the interruption must be treated as compensable hours of work. In addition, if an employee's sleeping time is interrupted to such an extent that the employee cannot get at least five hours' sleep during the scheduled period, then all hours of the sleeping period are compensable hours of work.

In addition to the above letters, LOMAR received, through its "parent" agency on the state level, "form" agreements for use

in residential facilities. These agreements provided the basis for the agreements drafted by a deputy county attorney for use by LOMAR. Plaintiff Lisa Hultgren, who was employed by LOMAR prior to *Garcia,* was required by LOMAR to sign the form agreement "as a condition of continued employment." LOMAR required the other plaintiffs to sign the forms as a condition of their initial employment as HSIAs.

Under the post-*Garcia* agreements, LOMAR's policy on sleep time was generally that this time was to be uncompensated. There were two exceptions. First, if employees documented a "call to duty" which required them to attend to a client for ten minutes or more during the night, employees would be paid for the documented time. Second, if the documented calls to duty were so frequent or lengthy that the employee got less than five hours of sleep, the employee would be compensated for the entire "sleep time" period. LOMAR interpreted this second exception to apply only when documented interruptions totaled three hours or more: it did not compensate employees, for example, if their sleep was interrupted for ten or fifteen minutes every hour throughout the night, because employees would still theoretically have received more than five hours of "sleep time." LOMAR never took into account any "undocumented" interruptions. Thus, employees were not compensated for any interruptions that required less than ten minutes of staff time, nor could these interruptions be counted in determining whether employees would be compensated for all eight hours of "sleep time."

In August of 1987, LOMAR became aware that its policy relating to sleep time was being investigated by the Department of Labor. A major subject of discussion between LOMAR officials and the Wage and Hour Division investigator was whether LOMAR's resident managers were subject to FLSA provisions, although the investigator reviewed the records for all employees. On November 4, 1987, the deputy county attorney advising LOMAR received a letter regarding the results of the investigation from the Area Director of the Employment Standards Administration of the Wage and Hour Division of the Department of Labor. This letter states that LOMAR had not properly compensated employees because employees who were covered by the FLSA had worked more than 40 hours per week, but had not received overtime pay as required by the Act. With respect to the calculation of hours worked, the letter further states:

> It is the position of the Department of Labor that the time spent by shift workers in sleeping is hours worked that must be paid for the same as any other hours worked.
>
> Sections 785.22 and 785.23 of Interpretive Bulletin 785 describe the only circumstances under which sleep time may be excluded from hours worked under the Act. Sleep time is excludable only for employees on duty for 24 hours or more and/or employees residing on the employer's premises or working at home. For your information, attached are copies of opinion letters dated February 3, 1981 and August 20, 1985, which explain in detail the policy of the Wage Hour Division with respect to determining hours worked by employees in group homes.

The Wage and Hour investigator testified that the "shift workers" referred to in the Area Director's letter included all employees not living on the premises.

After concluding that LOMAR's failure to properly compensate employees "constitutes a liability for the employer," the Area Director's letter suggests that this liability can be satisfied by paying back wages to the employees under the supervision of the Department of Labor. The letter then requests LOMAR to compute the amount of overtime due each employee since April 15, 1986, in accordance with the investigator's instructions.

Shortly after LOMAR's receipt of the November, 1987, letter, on January 8, 1988, the Administrator of the Wage and Hour Division issued a memorandum temporarily suspending all investigations of group homes "now in progress in which hours worked are an issue" pending further notice. The suspension was due to possible

inconsistencies in enforcement which the national Wage and Hour Office sought to investigate. In a memo dictated in June, 1988, the investigator who met with LOMAR officials noted that he had submitted the LOMAR file for review by the national office and had advised LOMAR of the investigation's "moratorium status pending receipt of written instructions."

The January 8 suspension memorandum did not affect the rights of individuals to sue for back wages under the Act, and on February 18, 1988, plaintiffs herein exercised their independent right under section 16(b) to seek unpaid wages and overtime compensation. *See* 29 U.S.C. § 216(b). Plaintiffs' complaint alleged the county violated the Fair Labor Standards Act by failing to compensate them for hours spent overnight in community residences for the mentally retarded because plaintiffs were not free to leave the premises and "were frequently interrupted during such overnight periods because of having to attend to and care for mentally retarded clients."

On June 30, 1988, the Wage and Hour Administrator issued an enforcement policy directed to the compensation of sleep time for employees who work in group homes for the mentally retarded and similar residential care facilities. This policy provides relief employees must be compensated for sleep time unless (1) employees are provided private quarters in a home-like environment, (2) the employer and employee have agreed in advance that sleep time will be deducted from "hours worked," (3) the employees get at least five hours of sleep during the scheduled sleeping period, (4) employees are compensated for any interruptions in sleep, (5) no more than eight hours is deducted for each full 24–hour on-duty period, and (6) relief employees are relieving a "full-time" employee as described more specifically in the policy.

LOMAR's executive director testified that the 1988 policy represented a change, in his view, with regard to the Department's policy, because the policy did not allow an employer to count "free time" in determining whether an employee worked 24 hours or more. In the past, LOMAR had attempted to come within the regulation allowing a deduction of sleep time for employees who worked 24 hours or more by scheduling relief employees for "free time" after they were free to leave the facility in the morning, so that their "on duty" time, "sleep time," and "free time" equalled at least 24 hours.

## II.

■ This case involves only the time period from August 15, 1986, through February 18, 1988. The primary issue on appeal is whether the county violated the FLSA by failing to compensate LOMAR's relief workers for all of their scheduled "sleep time" during this period. Under the FLSA, whether sleep time is work time "is a question of fact," which must be determined "in accordance with common sense and the general concept of work or employment." *Central Missouri Telephone Co. v. Conwell,* 170 F.2d 641, 646 (8th Cir. 1948). *See Skidmore v. Swift & Co.,* 323 U.S. 134, 136–37, 65 S.Ct. 161, 162–63, 89 L.Ed. 124 (1944); *Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944); *Rokey v. Day & Zimmerman,* 157 F.2d 734, 738 (8th Cir.1946), *cert. denied,* 330 U.S. 842, 67 S.Ct. 1082, 91 L.Ed. 1288 (1947).

"This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances." *Skidmore,* 323 U.S. at 137, 65 S.Ct. at 163. The rulings, interpretations, and opinions of the Wage and Hour Division Administrator "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance," although such rulings are not controlling. *Id.* at 140, 65 S.Ct. at 164. The issue, at bottom, is whether the employee's time is spent predominately for the benefit of the employer or the employee. *Armour,* 323 U.S. at 133, 65 S.Ct. at 168.

This Court has held sleep time was properly excluded from work time where em-

ployees were on duty as firefighters for 24 hours, were paid for 16 of those hours, were provided with separate sleeping facilities, and were, with very infrequent exceptions, able to obtain eight hours of uninterrupted sleep each night. *Rokey*, 157 F.2d at 735–36, 738. In contrast, the Court has ruled all hours should be compensated as work time where telephone operators were on duty 11 hours per night, were paid for eight or nine of those hours, were provided only with cots near the switchboard on which to sleep, and were, on at least some nights, disturbed at frequent intervals. *Central Missouri Telephone*, 170 F.2d at 645–46.

In analyzing the facts of this case, the magistrate concluded that overnight work as a relief employee in a group home for the mentally retarded was closer to the work of the telephone operator in *Central Missouri* than to the firefighter in *Rokey*. In reviewing the trial court's findings of fact, we give deference to the court's opportunity to judge the credibility of the witnesses and will reverse only if, upon review of the entire record, we are left with the definite and firm conviction that a mistake has been made. *Amadeo v. Zant*, 486 U.S. 214, 223, 108 S.Ct. 1771, 1777, 100 L.Ed.2d 249 (1988); *Anderson v. Bessemer City*, 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); Fed.R. Civ.P. 52(a).

We find no clear error here. The record amply supports the magistrate's finding that plaintiffs rarely were able to obtain a full night's sleep while on duty at LO-

MAR's facilities. It is undisputed that the clients at each facility displayed behaviors which required the attention of staff during the night, and although plaintiffs were compensated when called to duty for ten minutes or more, they were only compensated for such documented calls to duty. The record reflects that plaintiffs' duties frequently included other tasks at night which precluded them from sleeping but which did not require a documented "call to duty." [3]

The relevant regulations, opinion letters, and the most recent policy statement issued by the Wage and Hour Division provide further support for the conclusion that plaintiffs' "sleep time" should properly be viewed as "work time" under the FLSA. Prior to February, 1988, relief employees such as plaintiffs were required to provide actual relief to resident managers for less than 24 hour periods: the typical 2:45 p.m. to 8:30 a.m. shift, for example, amounts to approximately 18 hours of scheduled duty, including "sleep time." Under 29 C.F.R. § 785.21, an employee on duty for 24 hours or less is deemed to be "working" the entire time he or she is on duty, regardless of whether the employee is permitted to sleep or is provided facilities for sleeping. Indeed, the county concedes that if section 785.21 applies, relief employees should be compensated for their "sleep time." [4]

To avoid the effect of section 785.21, LOMAR scheduled relief workers for 24 hour shifts by adding a component of "free time" to their duties. Using the typical example above, a relief employee who left

3. For example, plaintiffs were required to listen to make sure clients returned to their rooms after a trip to the bathroom or kitchen, were required to get up to check on the whereabouts of clients, and were required to direct clients back to their rooms. The clients who resided in LOMAR's facilities had a wide range of psychological and physical disorders which made these tasks more difficult and more numerous than might be expected. Plaintiffs testified these types of interruptions occurred from five to twenty-five or thirty times per night.

4. We note that at least one court has questioned whether section 785.21's absolute inclusion of all "sleep time" as work time is consistent with the Supreme Court's direction that courts consider all of the relevant circumstances, presum-

ably including the number of hours worked as well as other factors, in determining what constitutes "work time" under the FLSA. *See Beaston v. Scotland School for Veterans' Children*, 693 F.Supp. 234, 238 (M.D.Pa.1988), *aff'd without opinion*, 869 F.2d 587 (3d Cir.1989). As a general rule, it may well be that the shorter an employee's "tour of duty," the more likely it is that he or she is spending that tour engaged in work for the benefit of the employer. We find it unnecessary to resolve the degree of deference to be given section 785.21's absolute prohibition on deduction of "sleep time," because our conclusion regarding plaintiffs' "sleep time" is the same regardless of whether section 785.21 or section 785.22 applies.

the facility at 8:30 a.m. would then be "off duty" from 8:30 a.m. to 2:45 p.m. that afternoon. From August, 1986 through February, 1988, the monthly schedules of relief workers expressly acknowledged that off duty hours were not shown on the schedule and that during such off duty time "the employee is relieved from performing the required duties and may engage in normal private pursuits."

LOMAR defended its use of "off duty" time by arguing plaintiffs were "on call" during their "off duty" hours, but plaintiffs testified they never were told they were "on call" after they left a group home in the morning, they were never called back to a group home during their "off duty" time, and they were never required to leave phone numbers or other information regarding where they could be reached. Under these circumstances, the magistrate appropriately found "allowing relief employees such as the plaintiffs to be classified under § 785.22 instead of § 785.21 could only be accomplished by what appears to be a quick manipulation of reality which turned 'off-duty' hours into alleged 'on-call' hours.... These alleged 24–hour shifts were more fantasy than reality."

Even assuming section 785.22 of the regulations applies, both this regulation and the opinion letters from the Wage & Hour Deputy Administrator are premised on the notion that employees are able to get a full night's sleep and are provided with adequate sleeping facilities or a home-like environment in a group home setting. The sleeping accommodations for plaintiffs in this case, who were generally in a different group home each night they worked and who often slept on a sofa or hide-a-bed in the living room, are simply not the same as the environment envisioned by the opinion letters. Moreover, plaintiffs did not usually enjoy an uninterrupted night's sleep, both because of nature of their sleeping accommodations and because, as a general rule, the clients who resided in LOMAR's facilities were "prone to being up at night, often frequently, and on a consistent basis over time." Thus, "the very nature of

plaintiffs' jobs required that they be ready for frequent nighttime interruptions."

Nor did plaintiffs agree that their "sleep time" could be uncompensated. The Deputy Administrator's 1985 opinion letter stresses that only "mutually agreed-upon" sleep time may be excluded: the exclusion of sleep time may not be the "unilateral decision of the employer." The magistrate in this case found LOMAR's post-*Garcia* contracts "were drafted exclusively by the defendant with no input or negotiation from the plaintiffs or even any bargaining agent for them.... The evidence is uncontradicted that the contracts at issue in this case were most certainly presented on a take-it or leave-it basis without any possibility for negotiation by the plaintiffs."

Although the county agreed to compensate employees whose sleep was significantly interrupted, the county's system of counting only interruptions that lasted ten minutes or more effectively excluded many of the "smaller" interruptions which cumulatively resulted in plaintiffs averaging from zero to four hours of sleep each night. Under the regulations, if an employee cannot get at least five hours of sleep during the designated "sleep time," the entire period is to be counted as "work time." 29 C.F.R. § 785.22.

We have no difficulty concluding, under all of the above circumstances, that plaintiffs were required at all times during their scheduled "sleep time" to be at LOMAR's facilities "ready to serve," and "were not there for the purpose of sleep nor for any purpose of their own, but for their employer's benefit." *Central Missouri Telephone*, 170 F.2d at 646. The magistrate's conclusion that LOMAR's failure to compensate relief employees for their "sleep time" violated the FLSA must, therefore, be affirmed.

## III.

■ The county argues that, even assuming a FLSA violation, the magistrate erred in assessing damages of the amount of unpaid wages due each plaintiff for uncompensated sleep time hours because LOMAR's position regarding sleep time was

based upon the Deputy Administrator's opinion letters interpreting Wage and Hour regulations. Under 29 U.S.C. § 259(a), employers may establish a "good faith" defense to liability for violations of the Fair Labor Standards Act if they plead and prove at trial

> that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subdivision (b).

In the case of the Fair Labor Standards Act, subdivision (b) provides that the "agency" is "the Administrator of the Wage and Hour Division of the Department of Labor." *Id.* § 259(b). The test under section 259 is an objective one. To invoke the defense in this case, the county must prove (1) LOMAR's compensation policies were adopted in reliance on a written interpretation of the FLSA by the agency designated with such authority in the statute, (2) LOMAR's policies were in conformity with that interpretation, and (3) LOMAR acted in good faith. *See Cole v. Farm Fresh Poultry Inc.*, 824 F.2d 923, 926 (11th Cir.1987); *EEOC v. Home Insurance Co.*, 672 F.2d 252, 263 (2d Cir.1982); 29 C.F.R. § 790.13.

Section 259's legislative history indicates Congress intended the defense to apply where employers innocently and to their detriment follow the law as interpreted by a government agency, without notice that the agency's interpretation was invalid or in error. *Olson v. Superior Pontiac–GMC, Inc.*, 765 F.2d 1570, 1579–80 (11th Cir.1985). The defense is essentially an estoppel defense to protect employers from an agency's mistakes in statutory interpretation. *Cole*, 824 F.2d at 929.

 In this case, the magistrate found the county had not established its entitlement to the defense because (1) the opinion letters it relied upon were issued by a Deputy Administrator rather than the Administrator of the Wage and Hour Division and (2) the county did not act in good faith. We agree that the county may not invoke

the good faith defense, although for somewhat different reasons.

A. Written interpretation by a designated agency

Section 259 expressly requires that the regulation, order, ruling, approval, interpretation, administrative practice, or enforcement policy relied upon be that of an "agency of the United States," defined in subsection (b) as the Administrator of the Wage and Hour division for alleged violations of the FLSA occurring after May 14, 1947. 29 U.S.C. § 259. Courts have interpreted this requirement literally, holding, for example, that the agency's advice may not be oral and must be specific enough to provide guidance. *See Cole*, 824 F.2d at 927–30; *Home Insurance*, 672 F.2d at 265.

We have reviewed the 1981 and 1985 opinion letters from the Deputy Administrator relied on by LOMAR in this case and agree with the county that these letters may properly be characterized as the position of the agency for purposes of section 259, even though they are not signed by the Administrator. The letters are specifically in reference to conditions in residential group homes for the mentally retarded and appear written to convey the agency's position with respect to compensation issues. Regulations interpreting section 259 emphasize that Congress intended the defense to apply where guidance has been given by "those who actually have the power to act as (rather than merely for)" the agency. 29 C.F.R. § 790.19. While an employer who relies on the statement of a lesser official is not relieved from liability unless the official's statement "is in fact the interpretation of the agency," *id.*, we are prepared to assume for purposes of this case that the Deputy Administrator was "the authority vested with power to issue ... interpretations ... of a final nature as the official act or policy of the agency" with respect to application of the sleep time regulations. *Id.*

B. In conformity with the agency's interpretation

The county thus would be entitled to a good faith defense based on its reliance on

the opinion letters, *if* its actions actually conformed with the letters *and* were objectively reasonable. As the Second Circuit has noted, section 259's language

> "in good faith in conformity with," precisely links the question of good faith to an act in conformity, and if there is no conformity, general good faith in other respects cannot save the day.

*Home Insurance,* 672 F.2d at 265.

"An employer may well make an honest effort to become informed as to the precise requirements of the Act," but will not be insulated from liability for unpaid wages unless its actions actually conform to the agency's guidelines. *Id.* at 266. Our review of the letters regarding the compensation of sleep time convinces us that, regardless of whether LOMAR subjectively believed it was complying with the letters, LOMAR in fact did not act in conformity with them.

Both letters carve out an exception to the agency's regulations on sleep time based on the assumption that the facilities in which the employees work constitute a "home-like environment ... with private quarters and other amenities." The county effectively has conceded that plaintiffs in this case simply were not provided with such quarters.[5] The letters are also based on the assumption that employees are able to get a full night's sleep. The evidence in this case establishes beyond question that relief employees averaged from zero to four hours of sleep during the nighttime hours. Where the demands of a job seriously interfere with an employee's ability to sleep, the 1981 letter expressly precludes deduction of sleep time from hours worked.

There are other inconsistencies between the circumstances described in the opinion letters and the actual circumstances at LOMAR's community residences. As the magistrate recognized, the opinion letters require that employees agree to any uncompensated sleep time, that employers

provide compensation for all disturbances, and that the entire "sleep time" be paid when employees are unable to obtain five hours of sleep. LOMAR's relief employees were not compensated for their sleep time even if they were unable to get five consecutive hours of sleep, they received compensation only for "significant" disturbances of ten minutes or more, and their "consent" to uncompensated sleep time was obtained as a non-negotiable condition of their employment.

Finally, the letters appear premised on the notion that the relief employees remain on the premises for at least 24 hours, and often as long as two or three days. LOMAR's relief employees were scheduled for different facilities every shift, and did *not* remain on the premises for 24 hours or more. LOMAR's attempt to create a 24 hour shift by adding six hours of unscheduled "off duty/on call" time at the end of each shift does not comport with the circumstances described in the opinion letters.

Section 259 "was not intended to allow an employer to insulate itself from liability for the consequences of its own improvident interpretation of the statute." *Home Insurance,* 672 F.2d at 266. Because we find LOMAR's policy on compensation of sleep time was not in conformity with the opinion letters upon which it alleges reliance, we agree with the magistrate's conclusion that the county has failed to establish a good faith defense under section 259. *See generally* 29 C.F.R. § 790.14.[6]

**C. Liquidated damages and good faith**

Under section 216, an employer not entitled to a defense under section 259 "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Section 216's provision for liquidated damages is

---

5. The county argues it provided "adequate" sleeping facilities, but both letters clearly are premised on the notion of more than this. The 1981 letter specifically notes that sleep time cannot generally be deducted where sleeping facilities are "minimal."

6. Because of our holding concerning lack of conformity, we need not reach the question of good faith, except insofar as it bears on the question of liquidated damages.

intended in part to compensate employees for the delay in payment of wages owed under the FLSA; it is a penalty or a punishment. *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 707, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945); *Overnight Motor Transportation Co. v. Missel,* 316 U.S. 572, 583, 62 S.Ct. 1216, 1222, 86 L.Ed. 1682 (1942); *Marshall v. Brunner,* 668 F.2d 748, 753 (3d Cir.1982); *McClanahan v. Mathews,* 440 F.2d 320, 325 (6th Cir.1971).

As originally enacted, section 216's liquidated damages provision was mandatory. In 1947, Congress amended this section by enacting section 260, which gives the court some discretion in awarding liquidated damages. *See* 29 U.S.C. § 260. Under section 260, if the employer shows that its actions were taken "in good faith" and with "reasonable grounds for believing" they complied with the FLSA,

> the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

*Id.*

■■■ The employer bears the burden of proving an honest intention to ascertain and follow the dictates of the FLSA. *Marshall,* 668 F.2d at 753. In this case, LOMAR officials testified they obtained relevant Wage and Hour regulations and opinion letters and consulted with counsel numerous times in attempting to comply with FLSA requirements. LOMAR's executive director testified he believed at all times LOMAR was in compliance with the Act, and we find no reason to doubt LOMAR's "honest intention" to comply with the law. *See Dalheim v. KDFW–TV,* 712 F.Supp. 533, 539 (N.D.Tex.1989).

To avoid a liquidated damages award, however, the employer must also prove its position was objectively reasonable. *Id.* at 539–40; *Marshall,* 668 F.2d at 753. The magistrate in this case found LOMAR's reliance on counsel was objectively reasonable up until it received the November 4, 1987, letter following the Wage and Hour Division's investigation of LOMAR's sleep time and other policies.[7] Ordinarily, we would agree that such a letter would deprive the employer of a good faith defense. *See, e.g., Joiner v. City of Macon,* 814 F.2d 1537, 1539 (11th Cir.1987). In this case, however, the Wage and Hour investigator testified that the investigation which prompted the letter was suspended shortly after the letter was sent based on a directive from the national Wage and Hour office. The national office was concerned that there had been inconsistent enforcement of Wage and Hour guidelines with respect to the issue of hours worked by employees in group homes, and later determined that additional guidance was needed. Contrary to the findings of the magistrate, the investigator's notes show LOMAR was advised of the investigation's "moratorium status pending receipt of written instructions" from the national and regional offices. These "written instructions" were not issued until June, 1988.

Other courts have held that uncertainty about the application of the Act may be considered in determining the appropriateness of liquidated damages. *See General Electric Co. v. Porter,* 208 F.2d 805, 816 (9th Cir.1954), *cert. denied,* 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097 (1954); *Dalheim,* 712 F.Supp. at 540–41; *Wyatt v. Holtville Alfalfa Mills,* 106 F.Supp. 624, 633 (S.D.Cal.1952), *remanded on other grounds,* 230 F.2d 398 (9th Cir.1955). Although we usually give great deference to the trial court's decision concerning a liquidated damages award, in this case we find the magistrate abused his discretion in re-

---

7. This finding is somewhat inconsistent with the magistrate's finding of a lack of good faith under section 259, although it appears the magistrate based his analysis under section 259, at least in part, on counsel's reading of the opinion letters in a way that was "most favorable to the county." We believe this, as well as the other factors cited by the magistrate in his section 259 discussion, relate more to the issue of lack of conformity with the opinion letters than to the county's lack of good faith. While we find LOMAR did not conform to the requirements in the opinion letters concerning when an employer could properly exclude "sleep time" from an employee's "work time," we agree with the magistrate that in this case LOMAR's reliance on counsel's interpretation of those requirements was not unreasonable.

fusing to find LOMAR reasonably relied on the suspension of all Wage and Hour sleep time investigations, pending further review by the national office. We thus conclude LOMAR had reasonable grounds for believing its position did not violate the FLSA, at least from April 15, 1986, through February 18, 1988. The magistrate's award of liquidated damages from November 4, 1987, must, therefore, be reversed. *See Clymore v. Far-Mar-Co.*, 709 F.2d 499, 505 (8th Cir.1983).

Although plaintiffs are entitled to no liquidated damages, they may well be entitled to prejudgment interest. *See Ford v. Alfaro*, 785 F.2d 835, 842 (9th Cir.1986); *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1102 (8th Cir.1982); *McClanahan*, 440 F.2d at 325–26. *See generally Hodgson v. American Can Co.*, 440 F.2d 916, 922 (8th Cir.1971) (awarding prejudgment interest in suit brought by Secretary of Labor). Because the magistrate has not had the opportunity to consider this issue, we remand the question of prejudgment interest to the trial court for its consideration.

### IV.

In conclusion, we hold the county violated the Fair Labor Standards Act by failing to compensate overnight relief workers employed in community residences for the mentally retarded for their "sleep time." The record unquestionably supports the magistrate's findings that this time constituted "work time" within the meaning of the FLSA. We further hold the county failed to establish a good faith defense to liability for unpaid wages under section 259, because its policies were not in actual conformance with the Wage and Hour opinion letters upon which it relied. On these issues, the magistrate's decision is affirmed.

With respect to the issue of liquidated damages, however, we agree with the county that its position, although ultimately proven to be in error, was taken in good faith and with a reasonable basis for believing it complied with the FLSA. The magistrate's award of liquidated damages from November 4, 1987, is accordingly reversed

and the case is remanded for consideration of the issue of whether, given that plaintiffs will no longer receive liquidated damages, an award of prejudgment interest is warranted.