**Kathleen BLACKBURN, Plaintiff,**

v.

**The KANSAS ELKS TRAINING CENTER FOR THE HANDICAPPED, INC., a Kansas corporation, Defendant.**

**No. 97–1513–JTM.**

United States District Court, D. Kansas.

March 3, 1999.

---

**7.** The VE testified that there are 209,000 positions nationwide for surveillance systems monitors. (Tr. 293).

Litigant's Attorney Dwight A. Corrin, Wichita, KS, for Litigant Kathleen Blackburn, plaintiff.

Gaye B. Tibbets, Foulston & Siefkin L.L.P., Wichita, KS, for Ketch Housing Inc., a Kansas Corporation, defendant.

Dwight A. Corrin, Wichita, KS, for Kathleen Blackburn, counter–defendant.

## MEMORANDUM ORDER

MARTEN, District Judge.

This is an action by Kathleen Blackburn against her employer, The Kansas Elks Training Center for the Handicapped, Inc. (KETCH), for compensation under the Fair Labor Standards Act. The defendant has moved for summary judgment on several grounds. In her response, Blackburn concedes that one of her claims should be dismissed. The court, after reviewing the evidence and arguments submitted by the parties, concludes that the remaining portion of the case should also be dismissed.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that

there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Blackburn began working for KETCH in December 1994, after earning her degree in psychology from Emporia State University. Her first job was as an Individual Support Trainer–1, or IST–1. An IST provides direct care for individuals with developmental disabilities. Blackburn worked five shifts each week, working 4:00 p.m. to 10:00 p.m., and 6:00 a.m. to 8:00 a.m. Between 10:00 p.m. and 6:00 a.m., she slept on the premises.

KETCH provides employees who stay overnight with private quarters in a home-like setting. Rooms are furnished with a bed, dresser, night stand, and a closet. In some locations, there was a desk. If two clients live in a house or apartment, then there are three bedrooms, so that the IST has his or her own bedroom.

On December 8, 1994, Blackburn and KETCH entered into a written Reasonable Agreement, which stated how Blackburn would be compensated for the time she slept. In drafting the Agreement, KETCH relied on written guidance from the National Association of Private Residential Resources (NAPRR) and oral consultation with Joni Fritz of Ancor Consulting, who does wage and hour consulting. KETCH also reviewed the Department of Labor's 1998 enforcement policy.

The Agreement provided that Blackburn be given a schedule of "Duty Hours" which were hours she was required to perform duties and for which she would be paid. "Off Duty" hours were hours she was free to pursue her own activities. "Sleep Time" hours were hours she was to remain on the premises, have no scheduled duties, and be allowed to sleep for eight hours. The Agreement provided that Blackburn would record time she had to work during Sleep Time or Off Duty Time, and she would be paid for that work. If her Sleep Time were interrupted for a total of three hours, she would be paid for the entire eight hours of Sleep Time.

Blackburn was entitled to use the residence as her own if she wished and to three meals each day.

Blackburn never asked KETCH to rescind her sleep time agreement and never expressed dissatisfaction with it to her supervisors, though she did complain to her co-workers. If Blackburn had refused to sign the Agreement, she could have worked as an IST–1, but she would not have been scheduled for overnights.

In August 1995, Blackburn was promoted to IST–2. She was not regularly scheduled to work overnights, but she worked overnights as a relief worker. When the regular employee could not work, Blackburn could arrange coverage with one of about 70 other staff members, a temporary service, or she could "choose to do it herself for the overtime."

While working as an IST–2, Blackburn recorded her time just as she had as an IST–1 and knew she was not being paid for overnights. Asked if she had any evidence that KETCH's actions were caused by reckless disregard of the wage and hour laws, Blackburn responded only that she did not think the Agreement was consistent with a Department of Labor pamphlet she had read.

As an IST–2, Blackburn was on call every fourth week beginning in late 1995 or early 1996. She would be summoned by a pager. She usually just needed to answer questions over the phone. Sometimes the response would take just a few minutes, though in an emergency she would have to leave.

Blackburn's job as an IST–2 required her to schedule the IST–1s or other staff

to cover a number of residences, about seven, to meet with clients and supervisors, work with clients in the afternoon, and oversee another twelve houses where KETCH provided a staff member to provide support for clients who lived with family members. She also sometimes assumed responsibility for a similar operation for a second coordinator as well.

Sometimes Blackburn had as little as 30 minutes notice if there was a need to schedule a substitute.

Blackburn usually had to work at least one IST–1 shift a week, as well as do her job as an IST–2 during the day.

On her first assignment, one of the residents which Blackburn cared for was so physically aggressive, she could not take him into stores to do shopping for the household. This resident once got up at 6:00 a.m. and started wrecking the kitchen. Blackburn slept in the living room in case the resident got up during the night.

According to Blackburn, she was also required to do the shopping on her own time, since she was unable to physically restrain the resident. KETCH contends that any such shopping was directly contrary to her supervisors's orders that she do the shopping on-shift.

Blackburn brought her own towels and wash cloths. She also complains there were no curtains in the "home-like setting" bedroom where she slept.

Blackburn testified in her deposition that she was sometimes required to work a position if the scheduled worker was unavailable and "if we couldn't find someone else to work." (Pl.Dep. at 28). Sometimes Blackburn was able to find relief workers. According to Knauff, several different staff or workers from temporary agencies were available to fill in. Knauff testified that an IST–2 who performed relief duties did so as a matter of choice in order to earn overtime pay.

Blackburn could not estimate what portion of her calls could be handled over the phone. Pattie Knauff, the Director of Human Resources, testified that it would be "rare" for plaintiff to have a call that could not be handled over the phone.

When she was on call, she did not get a call every night. She did not have to stay within the Wichita city limits, the pager range was a little beyond that.

If Blackburn had an event she wished to attend or for some reason did not want to be on call, she could trade call shifts with others.

After she became a coordinator, KETCH began asking those on call to respond within ten minutes, but during the time at issue here, there was no specific time within which she was required to respond. When asked what would happen if she did not respond to a page, she was uncertain. There were back-up people available if the IST–2 did not respond to a call.

Blackburn was promoted to an exempt position on October 24, 1996, and she is not making a claim for anything that occurred past that date.

Blackburn's claim is not about any particular shift she worked. Instead, she believes that she deserved to be paid for all her on-call time and all of her sleep time. Her lawsuit challenges KETCH's policies as a whole, and not its application of those policies to a particular day or night.

Before she filed suit, Blackburn contacted the Department of Labor and asked whether KETCH's policies were in violation of the law. She understood that they were not.

The present lawsuit was filed on November 25, 1997.

### Conclusions of Law

In its motion, KETCH argues that (1) any claims by Blackburn for events prior to November 25, 1995 (2 years before the present action was filed) are time-barred; (2) that the Reasonable Agreement bars Blackburn's claim for sleep time compensation; and (3) that Blackburn's claims for on-call time are barred by 29 C.F.R. § 553.221, 785.17 and by Tenth Circuit case law. In her response, Blackburn con-

**1274**

cedes the latter point, and only argues about the compensability of the sleep time claims.

■ Under 29 U.S.C. § 255(a), the statute of limitations of claims under the FLSA is two years, or three years if the violation was willful. Accordingly, KETCH seeks to dismiss any claims for compensation for events prior to two years before the present action was filed. KETCH argues the plaintiff has failed to provide any evidence that, even if the FLSA were violated, the violation was willful in nature.

The court finds the defendant's argument is correctly advanced in light of the uncontroverted facts. As noted earlier, Blackburn was asked in her deposition what evidence she had that any violation was willful, and she responded only that she believed KETCH's policies were contrary to Department of Labor guidelines. In fact, when Blackburn contacted the Department of Labor prior to filing the present litigation, the uncontroverted facts indicate she was told that KETCH's policies were not illegal.

Blackburn contends in her response to the present motion that willfulness is shown by citing *Hultgren v. County of Lancaster,* 913 F.2d 498 (8th Cir.1990), in which the court found the plaintiff residential care workers were entitled to compensation for sleep time. *Hultgren,* however, is distinguishable from the present case. The plaintiff workers in that case were substitute workers rather than the normal, residential staff. As such, they were moved frequently from residence to residence, and did not have a chance to know their clients. The bedrooms in the residences were used by the regular staff, so the plaintiffs were forced to sleep "on a couch or a hide-a-bed in the living room;" the residents's nocturnal behavior—from escape attempts to aggressive or abusive behavior to attacking other residents was of such frequency and duration and "so numerous that it was impossible for plaintiffs to get even several hours of uninterrupted sleep." 913 F.2d at 500. The court

noted in the plaintiffs' testimony they were interrupted "from five to twenty-five or thirty times per night" during their "sleep time." 913 F.2d at 505 n. 3.

In the present case, in contrast, Blackburn was provided with her own bedroom. The uncontroverted facts indicate one instance of nocturnal behavior by a resident, in which the kitchen was disordered. There is no evidence that, as a result of resident behavior, Blackburn was subject to the frequent loss of sleep for an extended period of time. Blackburn also alleges she was required to do her shopping off-shift because otherwise she could not manage an aggressive resident. But it is also uncontroverted that Blackburn was paid on the first instance in which this occurred, and that, as with the instances in which she alleges she lost sleep, she never on subsequent occasions completed a time card showing the need for compensation.

Subsequent to that initial incident, Blackburn never gave notice to KETCH that she conducted off-shift shopping or that she lost sleep. Given that lack of notice, and the general adherence of KETCH's policies to those specifically approved in cases such as *Bouchard v. Region V Mental Retardation Services,* 939 F.2d 1323, 1328–31 (8th Cir.1991), the court holds that Blackburn's claims are limited to those occurring after November 25, 1995.

■ More importantly, the court also finds the claims advanced by Blackburn must be dismissed by the court pursuant to 29 C.F.R. § 785.23, which provides that an employer and employee may make a reasonable agreement specifying working hours, where the employee resides on the working premises for an extended period of time, and that the employee is provided private living quarters. Here, Blackburn has done nothing to show that the "Reasonable Agreement" entered into by the parties was unreasonable in fact. The Agreement complies with the 1988 Department of Labor enforcement guidelines.

In *Braziel v. Tobosa Developmental Services,* 166 F.3d 1061 (10th Cir.1999), the

Tenth Circuit recently upheld the granting of summary judgment, where the district court found that an *implied* contract existed which met the standards of 29 C.F.R. § 785.23. The court also rejected an argument, similar to one advanced by plaintiff here, that the Agreement would not cover her position once she was promoted to IST–2. The court concluded:

> Finally, appellants argue that 29 C.F.R. § 785.23, addressing the deduction of sleep time from hours worked where employees reside on an employer's premises, should not apply because they did not reside permanently in the houses where they worked as residential assistants. The district court held that this regulation applied to those appellants who worked shifts less than twenty-four hours, noting appellants' separate bedroom and bathroom facilities, and concluding that the regulation does not require a continuous stay on site. On appeal, appellants simply contend that disputed issues of fact exist which preclude the district court's holding. We agree with the district court that, under the facts of this case, § 785.23 applied to appellants who brought claims for work shifts less than twenty-four hours. The regulation does not require permanent residence, only that an employee reside on the premises "for extended periods of time." 29 C.F.R. § 785.23.

166 F.3d 1061, 1063 (footnote and record citations omitted).

Here, the fact that Blackburn may have been promoted does not render invalid the Reasonable Agreement which she had signed which determined how she was to be compensated. Even if she no longer resided permanently at one of the residences, the uncontroverted facts still establish that she was on the employer's premises "for extended periods of time."